**Curtis GRAVES, Individually and on behalf of all other voters and candidates similarly situated**

v.

**Ben BARNES et al.**

**Diana REGESTER et al.**

v.

**Bob BULLOCK et al.**

**Johnny MARRIOTT et al.**

v.

**Preston SMITH et al.**

**Van Henry ARCHER, Jr.,**

v.

**Preston SMITH et al.**

**Civ. A. Nos. A–71–CA–142 to A–71–CA–145.**

United States District Court, W. D. Texas, Austin Division.

Jan. 28, 1972.

David H. Berg, Stuart M. Nelkin, Houston, Tex., for Curtis Graves and others.

Joe Resweber, Charles J. Wilson, Houston, Tex., for defendants except State officials.

Samuel D. McDaniel, Asst. Atty. Gen., State of Tex., Austin, Tex., for State officials.

Oscar H. Mauzy, Dallas, Tex., Oscar H. Mauzy, David R. Richards, Austin, Tex., for Diana Regester and others.

Walter L. Irvin, Cleophas Steele, Dallas, Tex., for plaintiffs-intervenors Thelma T. Washington, and others.

Edward Idar, Jr., San Antonio, Tex., for plaintiffs-intervenors Joe J. Bernal, and others.

John L. Roach, Dallas Tex., for plaintiffs-intervenors Samuel G. Kail, and others.

Ronald L. Clower, Dallas, Tex., for plaintiffs-intervenors Dick Ree, and others.

E. Brice Cunningham, Dallas, Tex., for plaintiffs-intervenors George L. Allen, and others.

Roy Orr, Chairman, Democratic Committee, Dr. George Willeford, Chairman, Republican Committee, Earl Luna, Dallas, Tex., R. James George, Jr., Austin, Tex., for Bob Bullock, Sec. of State and others.

Robert M. Greenberg, Dallas, Tex., for Johnny Marriott and others.

Thomas C. Crouch, Dallas, Tex., for plaintiffs-intervenors Tom Crouch and others.

Robert W. Hainsworth, Houston, Tex., for plaintiffs-intervenors Robert Hainsworth and others.

Nathan W. Eason, J. Douglas McGuire, San Antonio, Tex., for Van Henry Archer, Jr., and others.

Before GOLDBERG, Circuit Judge, and JUSTICE and WOOD, District Judges.

PER CURIAM:

■■ We are once again in the Texas sector of the political thicket of legislative redistricting and required to contour the condition of the individual trees as well as the physiography of the forest as we explore for "crazy quilts," "groves," contiguity, compactness, specie, motivation in planting, and other possible impedimenta to constitutionality in redistricting. In ten years of wandering about this political thicket, we have not yet found the burning bush of final explanation.[1] While political processes do not easily lend themselves to judicial explorations, the Supreme Court has directed that the federal courts must play their constitutional roles in assuring the equal protection of the laws with regard to the effectiveness of the individual vote. We do not ever lightly assume the burden of the necessity of meddling with the affairs of another branch of government or with state governments, but the organics of our governmental system have not created the federal courts as political eunuchs. We realize that there is no perfect electoral process, for democracy is at best a search for "proximate solutions" to insoluble problems.[2] But although we essay our task with knowledge of the relative obscurity and difficulty of some inquiries that must be made in a redistricting case, we must nonetheless conduct vigorously our judicial search for the "proximate solutions" to the equal protection of the right to vote in conformance with the constitutional imperatives that have evolved. It is the conclusion of this Court that the Texas redistricting plan for the House of Representatives is not sufficiently proximate to the constitutional imperatives, and we find that plan to be an unconstitutional denial of the equal protection of the laws to all citizens of Texas. There are degrees of trespass, however, and with two exceptions in the proposed House of Representatives that are substantively more compelling than the rest of the Texas proposal, the counties of Dallas and Bexar, we conclude that the state legislature should be given another opportunity to purge itself constitutionally before this Court feels it incumbent to act judicially to correct the inequities. See Wells v. Rockefeller, 1969, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535. In the cases of Dallas and Bexar Counties the quality and the extent of the constitutional trespass is so egregious that it requires immediate relief.

STATUS OF THE CASES

This consolidated action results from four separate cases filed in four district courts. See F.R.Civ.P. 42(a). As background to the decision, we believe that it would be helpful to sketch the progress of the cases to their present status.

On October 22, 1971, Curtis Graves, a black State Representative from Harris County, filed suit in the Houston Division of the Southern District of Texas,

---

1. See Exodus 3:2 et seq.

2. R. Niebuhr, The Children of Light and The Children of Darkness (1944).

challenging the constitutionality of the present apportionment of Senatorial districts in Harris County because of alleged racial gerrymandering. Although an injunction against effectuation of the present Senatorial plan was sought by plaintiff, the convening of a three-judge court was not requested. This action was assigned to the court of the Honorable Carl O. Bue, Jr., United States District Judge, Southern District of Texas.

On November 2, 1971, Diana Regester and several other residents and qualified voters of the Tyler Division, Eastern District of Texas, challenged the Legislative Redistricting Board's plan for the House of Representatives on the grounds, *inter alia,* that unconstitutional disparities exist in the population of many House districts and that multi-member districts in Texas result in invidious discrimination against certain racial and political elements. Named as defendants in the suit were the Secretary of State of the State of Texas, the Chairman of the Democratic State Executive Committee, the Chairman of the Republican State Executive Committee, the Chairman of the Democratic Executive Committee of Smith County, and the Chairman of the Republican Executive Committee of Smith County, all of whom are charged by Texas law with the performance of certain duties pertaining to Texas primary and general elections. The plaintiffs, bringing their suit in their individual capacities and in behalf of all qualified voters in Texas, were authorized to maintain their action as a class action by order of the court.

Members of several classes were permitted to intervene, both individually and in their respective capacities, and to maintain their actions as class actions. The classes included: (1) black citizens and voters of Dallas County, (2) Mexican-American citizens and voters of Bexar and Dallas Counties (as well as other counties), (3) Republican citizens and voters of Dallas County, (4) poor and middle class citizens of Dallas County desiring to vote for and run for the office of State Representative, (5)

white, black, and Mexican-American citizens and voters who are members of the AFL–CIO, an unincorporated association composed of working men and women throughout Texas, and (6) certain black office-holders in Dallas County. This Court is now of the opinion that those conditional orders previously entered which granted class action status to the Tyler plaintiffs and to the six groups of intervenors enumerated above should be amended, F.R.Civ.P. 23(c) (1). The motions to intervene are granted only with respect to the individual and official capacities of the intervenors. The motions to sue or to intervene as classes are hereby denied in the interests of the sound judicial administration of these cases, and the pleadings are hereby amended to eliminate references to class representation, F.R.Civ.P. 23(d) (4). *See* Whitcomb v. Chavis, 1971, 403 U.S. 124, 128, 91 S.Ct. 1858, 1861, 29 L.Ed.2d 363, 367 n. 1.

The Tyler plaintiffs sought only declaratory relief. In his answer the Secretary of State requested a three-judge court pursuant to 28 U.S.C.A. § 2281, alleging that the inevitable result of any declaratory judgment against the defendants would be an injunction to effectuate the judgment and that injunctive and declaratory relief had essentially the same effect in a redistricting case. We do not feel it necessary to resolve the three-judge issue with regard to the Tyler case, for the panel is unanimous on all issues raised coterminously in the Tyler case and in the consolidated cases from the Northern and Western districts.

On November 2, 1971, subsequent to the filing of the Tyler action, suit was brought in the Dallas Division of the Northern District of Texas. The Dallas plaintiffs allege that the apportionment plan for the Texas House of Representatives is unconstitutional in that multi-member districts discriminate against certain racial, religious, student, and political groups. Injunctive relief against the challenged plan of apportionment and the convening of a three-judge court

pursuant to 28 U.S.C.A. § 2281 were sought by the plaintiffs. The action was assigned to the Honorable Robert M. Hill, United States District Judge, Northern District of Texas.

On November 24, 1971, the Chairman of the Republican Executive Committee of Bexar County and other Bexar County Republicans filed suit in the San Antonio Division of the Western District of Texas, attacking the multi-member apportionments of certain districts of the Texas House on the same general grounds stated in the actions filed in the Eastern and Northern Districts, and alleging that Senatorial districts in Bexar County were politically and racially gerrymandered. Injunctive relief and the convening of a three-judge court were requested by the plaintiffs. The Honorable Adrian A. Spears, Chief Judge of the Western District of Texas, to whom the action was assigned, subsequently made application to the Honorable John R. Brown, Chief Judge of the Court of Appeals for the Fifth Circuit, for the convening of a three-judge court in connection with this case.

### PRE-TRIAL PROCEEDINGS

At the direction of Judge Brown, the Honorable Joe E. Estes, Chief Judge of the Northern District of Texas, presided at an informal joint pre-trial conference held at Dallas on December 10, 1971, relating to the foregoing four actions. At the conclusion of the conference, an order was executed by all five of the judges, which found that, in each case, the just, speedy, and inexpensive disposition of the litigation required consolidation and the convening of a three-judge court. Judges Spears, Bue, and Hill each consented to the naming of another judge in his stead to become a member of any three-judge court which Judge Brown might convene. Judge Brown approved the order on the day of its entry.

On December 13, 1971, Judge Brown entered an order which constituted a three-judge court in each of the four cases. The order also consolidated the cases for hearing and submission and transferred them to the Austin Division of the Western District of Texas, *see* F.R.Civ.P. 42(a). The order also provided the following:

> "The Courts as constituted each have plenary power over all questions including, without limitation, the extent to which any one or more or all of the issues in each of the cases is for determination by a three-judge court or a single judge, and the nature, kind or character of relief to be granted or the form or content of any decrees and orders (whether separately or consolidated)."

■ We conclude that a three-judge court is required under 28 U.S.C.A. § 2281 in the Houston Case, and we deny plaintiff Graves' post-trial motion to sever. The Houston plaintiff asserts that his suit challenges only the redistricting of the Harris County Senate districts, not those of the entire state, and that the case is therefore a single-judge matter. We cannot agree, for we conclude that the plaintiff is challenging a state statute of general application throughout the state and is then seeking to *remedy* by injunction one county's apportionment scheme. *See* Whitcomb v. Chavis, *supra. Compare* the companion cases of Moody v. Flowers, and Board of Supervisors of Suffolk County, New York v. Bianchi, 1967, 387 U.S. 97, 87 S. Ct. 1544, 18 L.Ed.2d 643, where a three-judge court was held improperly convened when the plaintiffs challenged only the *local* districting schemes for county boards of single counties in Alabama and New York. *See also* Ince v. Rockefeller, S.D.N.Y.1968, 290 F.Supp. 878. Unlike *Moody* and *Ince*, the apportionment challenged in the Houston case is embodied in the Texas redistricting scheme for the entire state Senate, not an apportionment "of limited application, concerning only a particular county." Moody v. Flowers, 387 U.S. at 104, 87 S.Ct. at 1549. Under these circumstances, it is the nature of the statute challenged that requires a three-judge court, however plaintiffs may attempt to limit the remedy they seek. In addition,

it is not clear that the remedy can be limited.[3] The Texas Senatorial districts that are challenged primarily with regard to Harris County are not entirely within Harris County; thus, there could be a domino effect that could reach well beyond the relief given to a single county.[4]

At a joint pre-trial conference held at Austin, Texas, on December 22, 1971, the managing judge of the three-judge court entered an order providing for expedited discovery procedures in view of the filing deadline of February 7, 1972, for candidates for office in Texas. It was also ordered that the chairman of the Republican State Executive Committee and the chairman of the Republican Executive Committee of Smith County be realigned as plaintiffs. At a final joint pre-trial conference on December 31, 1971, it was stipulated by the parties to all four actions that any evidence heard in relation to any one case could be considered by the court with regard to all cases.

## BACKGROUND TO PRESENT LITIGATION

Earlier efforts to secure constitutionally sound legislative districting in Texas are recorded in Kilgarlin v. Martin, S.D. Tex.1966 (three-judge court), 252 F. Supp. 404, rev'd sub nom., Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed. 2d 771 (1967).

Under the provisions of Article 3, Section 28, of the Constitution of the State of Texas, a Legislative Redistricting Board is assembled if the Legislature fails to redistrict the State at its first regular session after the publication of each United States decennial census. Thus, the 62nd Session of the Texas Legislature, convened in January, 1971, was under constitutional mandate to redistrict both House and Senate.

No districting plan for the Senate was ever voted by the Legislature. The districting bill adopted for the House of Representatives was declared unconstitutional by the Supreme Court of Texas in Smith v. Craddick, 1971, 471 S.W.2d 375. The Legislative Redistricting Board then refused to redistrict the House, asserting that it had no power to do so. However, in Mauzy v. Legislative Redistricting Board, 1971, 471 S.W.2d 570, the Supreme Court of Texas issued a writ of mandamus ordering the Board to effect such redistricting. On October 15, 1971, the Board enacted a plan which redistricted the Texas Senate, and on October 22, 1971, it enacted a plan for the House of Representatives. Both plans are under attack in the current quartet of litigation.

I

In Reynolds v. Sims the Supreme Court wrote:

"By holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable.

\* \* \* \* \* \*

[T]he overriding objective must be substantial equality of population among the various districts, so that

---

3. The Senate apportionment plan was not challenged on the basis of population deviation, although the total deviation is 4.5%, involving 16,213 people.

4. Compare also Bussie v. McKiethen, 5 Cir. [No. 71–2783, September 14, 1971] in which the Court of Appeals did not require a three-judge court when the redistricting issue was raised in part under 42 U.S.C.A. § 1971(g), the Voting Rights Act, which empowers a single-judge court to act when no application for a three-judge court is made by the Attorney General or a defendant. The Voting Rights Act is not applicable to Texas. In addition, the plan presented by the State of Louisiana was disapproved by the Attorney General of the United States, pursuant to 42 U.S.C.A. § 1973(c), prior to adjudication by a single judge; thus, there was no state plan amenable to injunction.

the vote of any citizen is approximately equal in weight to that of any other citizen in the State."

377 U.S. 533, 577, 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506, 536 (1964). Subsequently, the Court made clear that whenever the fact of deviation from population equality is raised the burden falls upon the State to present "acceptable reasons for the variations among the populations of the various legislative districts." Swann v. Adams, 1967, 385 U.S. 440, 443–444, 87 S.Ct. 569, 572, 17 L.Ed.2d 501, 504. It also reiterated that allowable deviations were limited to those minor variations which "are based on legitimate considerations incident to the effectuation of a rational state policy," Reynolds v. Sims, supra, 377 U.S. at 579, 84 S.Ct. at 1391, and which "may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination." Roman v. Sincock, 1964, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620, 630.

In *Reynolds* the Court noted:

"We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement."

377 U.S. at 577, 84 S.Ct. at 1390. While not departing from the recognition that "[d]e minimus deviations are unavoidable," Swann v. Adams, 385 U.S. at 444, 87 S.Ct. 569, 17 L.Ed.2d 501, in Kirkpatrick v. Preisler, 1969, 394 U.S. 526, 531, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519, 524, a congressional redistricting case, the Court concluded:

"We can see no nonarbitrary way to pick a cutoff point at which population variances suddenly become *de minimis*. Moreover, to consider a certain range of variances *de minimis* would encourage legislators to strive for that range rather than for equality as nearly as practicable."

Consequently, in *Kirkpatrick* the Court elucidated its previous statements by holding as follows:

"[T]he 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality. See Reynolds v. Sims, 377 U.S. 533, 577 [84 S.Ct. 1362, 1389, 12 L.Ed.2d 506] (1964). Unless population variances among . . . districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small.

\* \* \* \* \* \*

"[The Constitution] permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown."

394 U.S. at 530–531, 89 S.Ct. at 1229. Because of differing factual situations from State to State, including the total population and the number of legislative positions, it remains true that "[w]hat is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case." Reynolds v. Sims, 377 U.S. at 578, 84 S.Ct. at 1390. The Supreme Court has implied its willingness to exercise greater "tolerance" in reviewing the State's justification for population deviation in the apportionment of State legislatures:

"In implementing the basic constitutional principle of representative government as enunciated by the Court in Wesberry [Wesberry v. Sanders, 1963, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481]—equality of population among districts—some distinctions may well be made between congressional and state legislative representation. Since, almost invariably, there is a significantly larger number of seats in state legislative bodies to be distributed within a State than congressional seats, it may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts

than in congressional districting while still affording adequate representation to all parts of the State. To do so would be constitutionally valid, so long as the resulting apportionment was one based substantially on population and the equal-population principle was not diluted in any significant way. Somewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting."

Reynolds v. Sims, 377 U.S. at 577–578, 84 S.Ct. at 1390. *See also* Abate v. Mundt, 1971, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399, which upheld a county legislative apportionment with a total deviation of 11.9%. However, the Court itself made very clear that *Abate* was *sui generis*, involving only local government apportionment. And the *Kirkpatrick* holding may substantially erode the "tolerance" dictum in *Reynolds*. In any case, the percentages upheld and rejected in other cases are of little enlightenment. The critical issue remains the same: Has the State justified any and all variances,

however small, on the basis of a consistent, rational State policy? While confessing the impossibility of exactitude in striving to fulfill the constitutionally mandated concept of one person, one vote, one value, the Court insists on conformity to this fundamental premise:

"[I]f . . . population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired."

Reynolds v. Sims, 377 U.S. at 581, 84 S.Ct. at 1392.

The 1970 Census reported the population of Texas as 11,196,730. The Texas House of Representatives is allotted 150 members. Hence, the average population per member is 74,645 According to the State's own figures, District 3 is overpopulated by 5.8% (4,298) and District 85 is underpopulated by 4.1% (3,081), for a total deviation of 9.9% (more than 7,300).[5]

5. Furthermore, the State's method of computing deviations in the multi-member districts may distort the actual percentage deviations in those eleven districts. The method, which corresponds to a method that was disapproved by the district court in *Kilgarlin* with regard to flotorial districts, consists of dividing the total population of a multi-member district by the number of representatives allotted to it and then distributing the population deviation to each representative position as if each position constituted a single-member district, arguably resulting in a sort of buried flotorial district. But a multi-member district is not a collection of single-member districts. It is one district, the plaintiffs contend, and the population excess or deficiency should be treated just like the population excess or deficiency in any other district: the total amount of deviation for the district should be calculated as a percentage above or below the single norm of the *ideal* district (74,645). The alleged distortion resulting from the State's calculation is best exemplified by the case of Dallas County. Allotted eighteen representatives for its population of 1,327,321, Dallas County is listed by the State as under-

populated by 1.2% (per representative position). If left undistributed, the total deviation for Dallas County, treated as one unit, would be approximately minus 21.6%. The parties' respective computations for Bexar County produce figures of plus .7% by the State and approximately plus 7.7% by the plaintiffs. Hence, the plaintiffs would calculate the total deviation for the State as about 29.3%, rather than 9.9%.

Since we have concluded that the 9.9% total deviation is not the result of a good faith attempt to achieve population equality as nearly as practicable, it is unnecessary for us to resolve this complex computational conflict. But we do think it significant to note that the total deviations for Dallas and Bexar Counties, respectively, amount to about 16,000 people and 5,500 people, for a total of around 21,500 people. The percentage deviation figures are only a shorthand method of expressing the "loss," dilution, or disproportionate weighting of votes. Just as the Court in *Reynolds* concluded that legislators represent people, not trees or cows, so we would emphasize that legislators represent people, not percentages of people.

In all of the evidence presented in this case, the State has not attempted to explain in terms of rational State policy its failure to create districts equal in population as nearly as practicable, nor has the State sought to justify a single deviation from precise mathematical equality. The lengthy depositions of the members of the legislative redistricting board and of the staff members who did the actual drawing of the legislative district lines are devoid of any meaningful indications of the standards used.

We must conclude that the State simply has not justified, under the constitutional mandates that we are required to apply, the deviations that admittedly exist in the plan before us. The State has argued that the deviations are justified in order to comply with a long-standing state policy, embodied in Section 26 of Article III of the Texas Constitution, Vernon's Ann.St., against crossing county lines. We agree with the State to the extent of saying that this Court would look askance at any wholesale and unnecessary mutilation of political subdivision boundaries within the State. However, the preservation of county lines is simply not a per se justification for a population deviation. Reynolds v. Sims, *supra*; Kirkpatrick v. Priestler, *supra*. The real question is: Has Texas demonstrated a rational and consistent reason for maintaining its county lines at the admitted expense of greater disparities in population deviations? As the Texas Attorney General recognized in the predecessor case of *Kilgarlin*: "[C]ounty lines must be violated . . . to the extent necessary to carry out the mandate of the Supreme Court." 386 U.S. at 123 n. 2, 87 S.Ct. at 822, 17 L.Ed.2d 771. The present plan cuts the boundaries of 19 counties. We have been given no explanation whatsoever of the rational and consistent state policy that would necessitate the following of county lines in apportioning the Texas Legislature at the admitted expense of a substantial population deviation.

The last clause of Article III, Section 26 of the Texas Constitution reads as follows:

"[W]hen any one county has more than sufficient population to be entitled to one or more Representatives, such Representative or Representatives shall be apportioned to such county, and for any surplus of population it may be joined in a Representative District with any other contiguous county or counties."

In 1965, pursuant to this proviso, the Legislature created several so-called flotorial districts. *See* Davis v. Mann, 1964, 377 U.S. 678, 686–687 n. 2, 84 S.Ct. 1441, 1445, 12 L.Ed.2d 609, 615, for descriptions of such districts. These flotorial districts were disapproved by a three-judge federal court in Kilgarlin v. Martin, S.D.Tex.1964, 252 F.Supp. 404, 418, aff'd sub nom., Kilgarlin v. Hill, *supra*. Consequently, the Texas Supreme Court enunciated a procedure to be followed thereafter to comply with the State constitutional mandate, subject of course to the superseding requisites of the Fourteenth Amendment:

"4. With the nullification of the dictate relative to use of the surplus population (less than enough for a district) of a county which already has one or more representatives allocated thereto, it becomes permissible to join a portion of that county (in which the surplus population reside and which is not included in another district within that county) with contiguous area of another county to form a district. For example, if a county has 100,000 population, and if a district of 75,000 population is formed wholly within that county, the *county* is given its district, and the area wherein the 25,000 live may be joined to a contiguous area."

Smith v. Craddick, 1971, Tex. 471 S.W.2d 375, 378. In 1967 the Legislature, following Kilgarlin, enacted a redistricting plan which was in conformity with the procedure subsequently approved for dealing with the surplus population in

various counties. In the face of this unanimous and explicit directive of the State's highest tribunal, the legislative redistricting board, in four separate instances, has split the surplus population (the population greater than that allocable to a whole number of representatives) between two additional districts. Thus, Smith and Brazoria Counties received one whole representative, Hidalgo two, and Jefferson three; but the excess population in each county was divided between two other representatives' districts. The State has ventured no explanation whatsoever even of the necessity for these depredations against the State policy.

The only crossing of a county boundary for which the State suggested an explanation was that of Red River County. While it is certainly understandable that cutting some county line in this area was necessary because of the population and location of Bowie County, no justification was advanced for the resulting plus 2.2% deviation in District 1 (Bowie and part of Red River) or for the plus 2.9% deviation in District 9 (the other part of Red River and five other counties). Moreover, the policy of preserving the integrity of county lines has been blatantly violated by the slicing of Smith and Hidalgo Counties without any justification to be found in the Fourteenth Amendment mandate for substantial equality. The State's figures show a plus 3.3% deviation for District 2 (one part of Smith and four other counties) and plus 2.6% deviation for district 14 (another part of Smith and three other counties). District 12, wholly within Smith County, contains only a plus .1% deviation. The State's figures also show a plus 1.5% deviation for District 51 (part of Hidalgo and part of Cameron County), a plus 2.2% for District 49 (another part of Hidalgo and three other counties), and a minus 2.9% in District 59 (a two-member district wholly within Hidalgo County). It should be emphasized that, leaving aside the deviations involved in the multi-member districts, unjustified deviations exist throughout the State, even in adjoining legislative districts. An example of the latter situation exists in East Texas, where District 3 (two whole counties) is overpopulated by 5.8% and District 4 (three whole counties) is underpopulated by 3.6%. The following list, which is not intended to imply an acceptable de minimis percentage, demonstrates the geographic distribution and varying makeup of the single-member districts with the largest deviations:

| District | Percentage Deviation | Location |
|---|---|---|
| 18 | plus 3.4 | two southeast counties |
| 27 | plus 4.2 | two northeast counties |
| 28 | minus 3.1 | two east central counties |
| 30 | plus 3.2 | five south central counties |
| 38 | plus 5.7 | three south central counties |
| 39 | plus 3.6 | six south central counties |
| 40 | minus 4.1 | two gulf coast counties |
| 45 | plus 4.6 | six southwest central counties and part of Bexar County |
| 54 | plus 3.8 | five north central counties |
| 55 | plus 3.1 | six northwest central counties |
| 57 | plus 3.4 | two Rio Grande Valley counties |
| 62 | minus 3.2 | the "core" of Taylor County (Abilene) |
| 66 | minus 3.1 | ten Panhandle counties |
| 70 | plus 4.3 | nine Rio Grande Valley counties |
| 77 | plus 4.1 | seven northwest counties |
| 78 | minus 3.7 | part of Harris County |
| 85 | minus 4.1 | part of Harris County |
| 92 | minus 3.7 | part of Harris County |

Even had the State demonstrated rational adherence to a State policy of not cutting county lines, deviations in several of the above districts would still be inexplicable. Adding a portion of Bexar County to the rest of District 45 increased its deviation by more than plus 4%. District 62 is totally surrounded by District 61, which has a minus 1.7% deviation; and District 61 is adjoined by District 55, which has a deviation of plus 3.1%. Having such large deviation in the three listed districts in Harris County is insupportable.

In addition to the fact that the State itself has not complied with the Texas Supreme Court's rulings in *Craddick*, we

note that *Craddick* offers little if any satisfaction of the *Reynolds* requirement that a State must justify any population deviations. *Craddick* simply makes no effort to explain any rational state policies that may be ensconced in Article III, § 26 of the Texas Constitution and the relation of that provision to the apportionment requirements of the Fourteenth Amendment. In fact, the Texas Supreme Court made clear that

". . . [t]he constitutionality of this redistricting statute [Article III, § 26 of the Texas Constitution] is the only question presented to us by the briefs and record."

471 S.W.2d at 376. And the Texas Supreme Court correctly noted:

"Again, all requirements of Section 26 [of Article III] are inferior to the necessity of complying with the Equal Protection Clause."

471 S.W.2d at 378. Finally, the Texas court concluded that the variegated disturbances of county lines perpetrated by the *Craddick* apportionment plan were not "either required or justified to comply with the one-man, one-vote decisions." 471 S.W.2d at 378. We fail to see how the State of Texas can argue that its own failure to produce evidence in *Craddick* regarding the constitutional mandates of the Equal Protection clause can somehow help to explain satisfactorily its failure to justify its population deviations in the new plan that is challenged in the instant cases. *Craddick* stands primarily for the proposition that the restrictive language of Article III, § 26 of the Texas Constitution is not facially unconstitutional under the Federal Equal Protection clause. Beyond that, the Texas Supreme Court summed up the general position that this Court must take:

"[A] county may be divided if to do so is necessary in order to comply with the equal population requirement of the Fourteenth Amendment."

471 S.W.2d at 377.

From the evidence and the plan presented, this Court is forced to conclude that the State of Texas simply had no rational state policy in the apportionment plan that resulted in the population deviations previously discussed and in the disparate treatments of metropolitan areas. The plan before the Court was not a product of legislative action, but of the action of a board of five members, only one of whom is a member of the legislature. It appears to this Court that the board never really acted as a board but only as individuals. There never seems to have been a tandem of operations among the board members with regard to the constitutional principles or even to any lesser policy guidelines. The committee met for hearings only four times. The full board did not participate in two of those meetings, and one member of the board testified that he did not pay much attention to the hearings in any event. The full board did not even meet to approve the final plan; it was merely passed around. In fact, only three members of the committee signed both plans. There is ample testimony that the board was given absolutely no legislative guidance, nor did the board begin from the legislative discussions that accompanied the earlier apportionment plans for Texas. As an example of what we must conclude to be considerable lack of rational direction, at no point in its deliberations did the board ever debate or discuss the general issue of single-member districts as opposed to multi-member districts, obviously a very important issue in any apportionment plan, and particularly in the Texas proposal. At no point in the case was there ever a rational and consistent explanation of the differing treatments accorded to Harris County as contrasted with every other metropolitan area in Texas. One conceivable and previously-urged "rational" explanation for these disparate treatments of metropolitan areas was thoroughly repudiated by the board's actions. In *Kilgarlin* the three-judge court was assured by the defendants [6] that the State's policy "lim-

---

6. Two of the five board members were defendants in the *Kilgarlin* case.

its the size of any multi-member district to fifteen Representatives" and that any county that attained a million or more residents in the future would be sub-divided for Representative districts. In their trial brief the State asserted that the explanation for the differing treatment of Dallas and Harris Counties was that whenever a county attained a million residents or was allocated fifteen legislators it would no longer be left as an at-large district. The district court in *Kilgarlin* approved the disparate treatment between Dallas and Harris Counties in the 1965 apportionment bill in reliance upon the State's representation that different treatment would be accorded a county once it attained a million population. Dallas County now has a population of well over one million, a greater population than Harris had in 1960. This earlier "policy" of the State of Texas was called to the attention of the redistricting board during its public hearings but was apparently ignored. The board's unexplained abandonment of an existing state policy belies the presence of any rational state policy.

This Court feels compelled to draw two conclusions from the evidence presented regarding the manner in which this plan was drawn:

First, whatever "tolerance" might conceivably attach to a State's explanation of deviations from a population ideal cannot reasonably or appropriately attach to the actions of a redistricting board which acted on the House of Representatives' plan only pursuant to a mandamus, Mauzy v. Redistricting Board, *supra*, and which proceeded to draw its conclusions in the manner just sketched. *See* Silver v. Brown, 1965, 63 Cal.2d 270, 46 Cal.Rptr. 308, 405 P.2d 132; Legislature of the State of California v. Reinecke, 99 Cal.Rptr. 481, 492 P.2d 385 (1972). *See generally* Connor v. Johnson, 1971, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268. We have serious doubts that this board did the sort of deliberative job contemplated by *Reynolds* as worthy of judicial abstinence.

Second, the State has failed to establish any rational and consistent state policy that would explain, let alone justify, its deviations from the constitutional principles of *Reynolds* and its progeny. Texas has also failed to provide rational justification for the haphazard combination of single and multi-member districts at issue in this case. This irrationality, without reasoned justification, may be a separate and distinct ground for declaring the plan unconstitutional. Arguably, the Fourteenth Amendment forbids a plan that reflects "no policy, but simply arbitrary and capricious action," Baker v. Carr, 1962, 369 U.S. 186, 226, 82 S.Ct. 691, 715, 7 L.Ed.2d 663, 691, Reynolds v. Sims, *supra*, and which is not "free from any taint of arbitrariness or discrimination," Roman v. Sincock, *supra*, entirely independent of any population deviations: "To the extent that a state's legislative apportionment plan is conclusively shown to have no rational basis, such a plan violates the Equal Protection Clause." Davis v. Mann, 1964, 377 U.S. 687, 694, 84 S.Ct. 1441, 1449, 12 L.Ed.2d 609, 619 (concurring opinion). *Cf. Swann, supra,* at 572. Even where there are theoretically valid rationales for deviating from exact population equality, those rationales must themselves be applied systematically throughout the state, not in an ad hoc manner in certain places and not at all in others. *See* Kirkpatrick v. Priesler, *supra*.

Several courts have invalidated plans containing unexplained mixtures of single and multi-member districts. In Kruidenier v. McCullock, 142 N.W.2d 355 (1966), the Iowa Supreme Court declared unconstitutional a reapportionment plan making one county a multi-member district while dividing the other counties into single-member districts. The court held that the scheme would not be sustained without reasoned justification. Since the State failed to show this, the court declared the plan invalid. A federal district court in Pennsylvania invalidated a reapportionment plan which,

like the Texas scheme, contained a "curious pattern of representative districts in the larger counties." Drew v. Scranton, N.D.Pa.1964, 229 F.Supp. 310, vacated and remanded on other grounds, 1964, 379 U.S. 40, 85 S.Ct. 207, 13 L.Ed. 2d 107. The district court particularly condemned the inconsistent and irrational method used in distributing single and multi-member districts. The court described a situation closely analogous to the one in this case:

"Defendants have offered no explanation for thus dividing fourteen of the larger counties entirely into single member districts while at the same time, dividing the fifteen other larger counties, many of them adjoining the single-member district counties, into a crazy quilt of one, two, three and four-member districts . . .. In the absence of any legislative history or other explanation justifying it and we have found none, we can only conclude that this districting is either the result of gerrymandering for partisan advantage . . . or that it is wholly arbitrary and capricious. The plaintiffs' contention is that thus providing a haphazard arrangement of two, three and four-member districts alongside of single member districts violates the basic principle of one man—one vote, which is, as we have seen, implicit in the constitutional sense of equal protection of laws in this field. We are constrained to agree with this contention."

229 F.Supp. 326.

■■ The most important inconsistency to be found in the Texas House plan is the different treatment given to the heavily populated counties. Harris County, the largest, is split into 23 single-member districts; all the other populous and metropolitan counties are put in multi-member districts of varying numbers of members, ranging up to 18 for Dallas County. Three of the 11 multi-member districts comprise entire counties (Travis, McLennan, and Dallas); in the other eight multi-member districts, the district lines cut boundaries without rhyme or reason. The board's mixture of multi-member districts is not explicable as an effort to preserve county lines or to achieve substantial population equality. The plan cannot be justified on the ground that it reduced deviations in population. Nor can the State justify the present plan on the basis of past State policy of either preserving county lines or limiting the size of districts. See Kilgarlin v. Martin, *supra*. The claim that Dallas was kept at-large to conform to popular sentiment is simply contradicted by the record; moreover, even if the board based its treatment of Dallas on grassroots sentiment, it could not constitutionally apply this standard in selected areas only. See Kirkpartick v. Preisler, *supra*. More important, as the Supreme Court held:

"An individual's constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State's electorate, if the apportionment scheme fails to measure up to the requirements of the Equal Protection Clause."

Lucas v. Colorado General Assembly, 1964, 377 U.S. 713, 736, 84 S.Ct. 1472, 1473, 12 L.Ed.2d 632, 647.

## II.

Because of our holding under Reynolds, we are not compelled to decide other questions raised by the plaintiffs pertaining to the entire State of Texas, although we do feel compelled to reach conclusions later in the opinion with regard to specific metropolitan areas.[7] Al-

---

7. Attorneys for the plaintiffs in the cases originally filed in the Eastern, Northern, and Western Districts indicated to the court that, because of the inherent time limitations incident to these actions, they would have difficulty in fully developing the evidence relating to their claims regarding multi-member districts other than Dallas and Bexar, and that therefore they would confine their evidence to the situations obtaining in those two counties. In response to this situation the Assistant Attorney General, representing the

though we approach the apportionment question with restraint, as we have indicated earlier, we would not fulfill our judicial responsibilities if we were to ignore the development of some major points of consideration for the Legislature, specifically considerations regarding multi-member districts. Therefore, when the Legislature reconsiders the general redistricting question, in conformity with our holding in Parts I, III, and IV, we believe that the following points should be given consideration in light of recent Supreme Court decisions and of the very real possibility of future litigation.

 While multi-member districts are not per se unconstitutional, neither are they constitutionally unassailable. *See generally*, Whitcomb v. Chavis, 1971, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363; Fortson v. Dorsey, 1965, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401; Burns v. Richardson, 1966, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376. The underpinning of the apportionment cases is the Fourteenth Amendment right to the individual voter to an effective vote within the general constructs of what is essentially a majoritarian system of representative government. *See generally* Reynolds v. Sims, *supra*; Kirkpatrick v. Preisler, *supra*; Swann v. Adams, *supra*. To our mind, a critical adjunct to the right to an effective vote is the First Amendment right to associate politically, whether in majority or minority. *See* Williams v. Rhodes, 1968, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24; *see generally*, NAACP v. Button, 1963, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405; NAACP v. Alabama, 1958, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488; *see also* Carter v. Dies, N.D.Tex.1970 (three-judge court), 321 F.Supp. 1358.

 While the Fourteenth Amendment does not prohibit all unequal treatment of individuals or groups and does permit rough accommodations, it does prohibit "invidious discrimination." Harper v. Virginia Board of Elections, 1966, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169.

> "[T]he concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged."

Reynolds v. Sims, 377 U.S. at 565, 84 S.Ct. at 1383, 12 L.Ed.2d 506. Whenever a State fashions a system that provides for unequal treatment among citizens who are roughly within the same congeries of circumstances, with regard to the "fundamental political right," of the vote, Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, or to the First Amendment right to associate "for the advancement of political goals," Williams v. Rhodes, *supra*, that State would be required to justify its unequal treatment on the basis of a "compelling state interest," NAACP v. Button, supra. *See generally*, Harper v. Board of Elections, *supra*; McDonald v. Board of Election Commissioners of Chicago, 1968, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739; Kramer v. Union Free School District, 1969, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583; Cipriano v. Houma, 1969, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647. This is particularly true when the state's distinctions in these fundamental areas are drawn on the basis of wealth. *See* Harper v. Board of Elections, *supra*; Carter v. Dies, *supra*; *see also* Rodriguez v. San Antonio Independent School District, 337 F.Supp. 280 (1971). Of course discriminations within the law that affect po-

State at the preliminary pre-trial conference on December 22, 1971, observed: "This is my personal view entirely, but I would think that the Plaintiffs' case can either be made or not be made in two or three of the major metropolitan areas, and I would anticipate, at least, that if multimember districting were knocked out, say, in Dallas and Tarrant County and Bexar County, that probably it would not be used elsewhere either, so that I have some difficulty personally in seeing the necessity of trying these issues as to eleven different metropolitan areas."

litical candidates correspondingly affect the right to vote and the right to associate politically, Williams v. Rhodes, *supra*. Therefore, if it can be established that a particular electoral apportionment scheme or even an entire electoral mechanism, discriminates among candidates and political groups on the basis of wealth, the test that the State must meet in order to justify the continuing inequality of treatment is one of compelling state interest.[8]

Some of plaintiffs before this Court are office-holders and potential candidates. And of course when we adjudicate the apportionment question or when the Legislature deliberates the question, the Court or the Legislature is also affecting the rights of candidacy and of political association.

It has been clearly established in the proceedings before this Court that it simply costs more for a candidate to run and to communicate with his or her electorate in any multi-member district than it does in any single-member district given roughly similar geographic and demographic circumstances, specifically given a metropolitan area.[9] The sheer numbers of people with whom one must communicate as a candidate vary enormously between multi-member and single-member districts. While the "ideal" Texas district is one of just more than 74,600 people, a candidate for one of the eighteen seats to the Legislature from Dallas County must campaign to over 1,300,000;[10] a potential candidate in Bexar County must plan on communicating to over 800,000; in Tarrant County a candidate must try to appeal to more than 600,000; and even in the smallest multi-member district, a part of Hidalgo County, a hopeful candidate must still take his campaign to 145,000 people. In addition, when the size of the campaign territory is increased to well over that of the ideal single-member district, as it is in every metropolitan multi-member district in Texas, the record establishes that the methods of campaigning become different and more expensive. When a candidate campaigns in a compact metropolitan area to a population of from 145,000 to 1,300,000 he must turn to high-expense methodology, such media as television, radio, or large newspaper spreads. If he were running in the "ideal" district, with only 74,600 people to reach, the record indicates that a candidate would be able to, and inclined to, employ less costly methods of campaigning and avoid television expenses in particular. All of this is not to say that television time, for example, is required by the adoption of any particular districting processes. It is to say, however, that there are substantial cost differences in campaign and communication expenses that are necessary in order to make a tenable showing as a candidate in a multi-member metropolitan district, that such costs in multi-member districts may operate to eliminate or to delimit candidates and political associations that would otherwise be able to wage more tenable campaigns, and that such differences in cost between

8. "To discriminate against voters or candidates on the basis of the depth of their pocketbooks . . . is to wade into unconstitutional waters."
Carter v. Dies, 321 F.Supp. at 1364 (Thornberry, J., concurring).

9. Of course the costs of campaign and communication vary substantially within Texas on the basis of geography alone; the costs in a single-member district in West Texas, for example, would differ, perhaps substantially, from the costs for a similar campaign or communication in a single-member district in an urban area such as Harris County. For a variety of demographic or geographic considerations, the expenses of campaigning and communicating may differ radically among political subdivisions without impinging on constitutional rights guaranteed to individuals and to groups. However, that observation does not answer the constitutional problem here.

10. One witness estimated that a campaign for a House seat in Dallas by an individual candidate not running on a slate would cost about $87,000; the salary of a Texas Representative is $4,800 per year.

single-member and multi-member districts are the result of the state action of redistricting.

Whether or not this inequality in campaigning costs between multi-member and single-member districts would be enough to invalidate all multi-member districts on First and Fourteenth Amendment grounds, independent of any disparate treatment among similar areas, we do not decide here. We doubt that such inequalities amount to invidious discrimination. The record before us is just not adequate in its facts to support the proposition that an identifiable individual candidate or political group in every Texas city has been discriminated against invidiously on the basis of wealth by the use of multi-member districts. To our knowledge the Supreme Court has not confronted this issue in any of the cases in which multi-member and single-member districts have been discussed, and we do not reach that precise issue in our case.

However, we do find in the Texas plan an anomalous bit of redistricting that does raise a considerable Equal Protection question along the same theoretical lines that we have outlined above with regard to candidates and political associations. Whatever else may be said about single-member districts versus multi-member districts, it is clear that they create radically unequal expense problems for candidates who wish to run for office in areas with very similar geographic and demographic characteristics. Every multi-member district in Texas is a metropolitan area. And every major metropolitan area of Texas has been multi-member districted, save one. The fact that Harris County (Houston) has been divided into single-member districts means that a candidate running in Harris County

for the Texas House is treated by Texas law in a manner that differs substantially from the treatment accorded to candidates running for the Texas House from every other metropolitan area in Texas. That difference in treatment results in a classifying of candidates and their abilities to run and to form political associations according to wealth, affecting basically and unequally the poor, *see* Harper v. Board of Elections, *supra,* and those not members of established political parties, *see* Williams v. Rhodes, *supra.* We emphasize that this is not a classification of differing groups with differing geographic and demographic surroundings, but of very similar urban electorates living in very similar geographic and demographic surroundings. In general, candidates from the cities must confront very similar problems and issues. The differing treatment of Harris County appears to result in a substantive inequality on the basis of wealth in the protection afforded by the State's electoral laws to the rights of political association and voting.[11]

The question then becomes: Has Texas demonstrated a compelling state interest for treating the candidates and political associations of Houston in a way different than it treats the candidates and political associations of other metropolitan areas of Texas? The State argues that it was following the "wishes of the people" when it dealt with its metropolitan areas. The argument simply does not ring true. The record demonstrates at several points that the people of Dallas indicated their overwhelming desire, by poll, for single-member districts; that evidence was placed before the redistricting board by several witnesses at its hearings, and the committee either ignored or denied those wishes. At the same time, there

---

11. The fact that a candidate might be able to decrease his or her expenses by joining the Democratic or Republican Party, or by running on an established slate, does not satisfy the requirements of the First and Fourteenth Amendments. See Williams v. Rhodes, *supra;* Carter v. Dies, *supra.* Nor does running through a particular party or on a particular slate appear to diminish substantially the cost differentials between urban multi-member districts and urban single-member districts in Houston.

is no evidence in the record that the redistricting board had before it any coherent "wishes of the people" of Houston or of any other area. The only reason assigned for this difference of treatment between Houston and every other metropolitan area is that some atmospheric sounding emanating from Harris County differed from those coming from other metropolitan counties. Such sonars must have some substantive or scientific basis for measurement data. It appears to this Court that if a State elects to use the "wishes of the people" to treat metropolitan areas differently and unequally, then it is under some obligation to do a more thorough job of investigating the real "wishes of the people" than was done by the Redistricting Board. Even if the atmospheric soundings were eventually adequate as a statistical matter, it is very questionable whether the State could submit opinion polls as a complete justification for taking constitutionally suspect action in apportioning a state legislature. *See* Hall v. St. Helena Parish School Board, E.D.La. 1961, aff'd, 1962, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521, cited with approval in Lucas v. Colorado General Assembly, 1964, 377 U.S. 713, 84 S.Ct. 1472, 12 L.Ed.2d 632. And, of course, any rationale, including opinion polls, would have to be applied equally to all areas of the State, not followed for one and ignored in others.

A second argument advanced by the State for its anomalous treatment of Harris County is what might be termed the "Whitcomb v. Chavis argument": that multi-member districts are constitutionally immune unless they dilute a racial or political element of the electorate. We simply point out that *Whitcomb* at no point discussed the relationship of multi-member districts to candidates and political associations. In addition, the Supreme Court in *Whitcomb* was not faced with different districting treatment accorded to similar metropolitan areas; the large urban areas of Indiana were treated in the same manner. There was an underlying rationale to the *Whitcomb* discussion of multi-member districts in Indiana: the State of Indiana argued that cities have city-wide problems and should elect city-wide representatives. Whatever might still be argued concerning the various factors within that justification for multi-member districts in *Whitcomb*, it is clear that Texas cannot offer the same rationale for its apportionment of its cities. The different treatment of Houston refutes the *Whitcomb* rationale at the threshold, and Texas confronts an entirely different Equal Protection question. Texas simply cannot justify its different treatment of Houston candidates on the basis of *Whitcomb* because its own internal inconsistencies in its treatment of Texas cities erases the general *Whitcomb* rationale for maintaining multi-member districts in metropolitan areas.

Texas also points to the *Kilgarlin* case, in which a three-judge district court and then the Supreme Court upheld a treatment for Houston that differed from that accorded to every other Texas city. In the plan under discussion in *Kilgarlin*, Houston was divided into thirds, along congressional district lines, while all other metropolitan areas in Texas were left as county-wide multi-member districts. Again, we point out that neither the district court nor the Supreme Court discussed the allegedly unequal treatment of candidates or political groups that may have resulted from that differing treatment. In addition, a division into thirds may not create the vast inequalities of expense that a division into single-member districts creates. Finally, we would note that the justification for differing treatment that was accepted by the courts in *Kilgarlin* was, like the *Whitcomb* justification, accepted for an underlying reason. The district court accepted the distinction that the State drew in 1966 between counties with more than one million people and those with less than one million; the State contended that the sheer numbers and

the resulting confusion that would probably occur in the electorate when the number of representative slots reached 15 necessitated a different treatment for the one million-plus counties. *See* Lucas v. Colorado General Assembly, *supra.*[12] Like the rationale of *Whitcomb,* we do not believe that the rationale accepted in *Kilgarlin* can explain a compelling State interest in this present incarnation of different treatment for Harris County. As we have indicated earlier in the opinion, Dallas County in 1971 fits all the elements of the *Kilgarlin* rationale for single-member districting, and yet Dallas remains a multi-member district, against the wishes of Dallas citizens we might add, while Houston has been subdivided even further than it was in the 1966 plan discussed in *Kilgarlin.* We can only conclude, as we did earlier, that there is simply no credibility left in the rationale advanced by the State in *Kilgarlin.* A state that inexplicably abandons an allegedly "compelling state interest" only five years after arguing it can hardly raise it from the dead at this point in the apportionment process.

Finally, the State argues that multi-member districts for metropolitan areas have long historical roots in Texas. Even given that fact, it simply does not explain the different treatment given to Houston. With the exception of the 1965 plan, the *Kilgarlin* plan discussed earlier, Houston has been treated under the same "historical" aegis as any other Texas city. We are at a loss to understand how Texas history can support a compelling state interest in multi-member districts for all cities when that history has suddenly done a complete about-face for the largest metropolitan area in the State. In addition, we would point out that history is a questionable justification for unequal treatment in a state with a history of rather active segregation and a state which has always been a "one-party" state. *See* Bussie v. McKiethan, 5 Cir., No. 71–2698 [September 4, 1971]. The underlying rationales of the Texas tradition of multi-member districts in metropolitan areas might very well be precisely those rationales condemned in recent constitutional decisions. We emphasize that we are not indulging in any sort of speculation whatsoever regarding the rationales for the political subdivisions of Texas. We are simply noting that Texas cannot rationally and consistently justify its different and unequal treatment of Houston and Houston candidates on the grounds of historical precedent. In addition to the factors discussed in other parts of the opinion, *see* Reynolds v. Sims, *supra;* Kirkpatrick v. Priesler, *supra,* the fact that Harris County has been treated differently, even though it falls within the same historical context as any other city, makes the position internally *inconsistent.*

Given the record before us, this Court must note that Texas has not established a compelling state interest, nor even a "rational relationship,"[13] to

---

12. "One of the *most undesirable features of* the existing apportionment scheme was the requirement that, in counties given more than one seat in either or both of the houses of the General Assembly, all legislators must be elected at large from the county as a whole. Thus, under the existing plan, each Denver voter was required to vote for eight senators and 17 representatives. Ballots were long and cumbersome, and an intelligent choice among candidates for seats in the legislature was made quite difficult. No identifiable constituencies within the populous counties resulted, and the residents of those areas had no single member of the Senate or House elected specifically to represent them." 377 U.S. at 731, 84 S.Ct. at 1471, 12 L.Ed.2d 506.

13. Even if the State were forced to meet only the lesser test of showing a "rational relationship" between its unequal treatment of Houston candidates and political associations and a state policy, we would be forced to conclude that Texas simply has not done so on this record. The disparate apportionment of Harris County renders questionable or outright irrational the justifications that the State has proposed for continuing to sanction vastly different campaign and communication costs among its urban representatives and urban electorates. See Harper v. Board of Education (Harlan, J., dissenting).

justify its disparate and unequal treatment of Harris County and every other metropolitan area in Texas. Because of the unjustified differentiation between Harris County and every other metropolitan area with regard to the expense of running for office and of communicating with an electorate, the use of multi-member districts in Texas cities is subject to serious constitutional question on the bases of the First Amendment, the Due Process clause, and the Equal Protection clause. The other side of the candidate coin is that fact that the electorate is much further removed from its elected representative in Dallas or Fort Worth or El Paso, for example, than is the electorate for the same office in Houston. While we are far from the Jeffersonian ideal or the modes of Grecian democracy, this voter anonymity, this contracting the voter to be a mere speck in a magnitudinous cosmos, takes us far from the founding fathers' concept of citizen participation.

## III.

One of the contentions of the Dallas plaintiffs is that the use of a multi-member district in Dallas County in the legislative redistricting plan operates to minimize or cancel out the voting strength of the black minority. Of course, it is settled law that apportionment schemes employing multi-member districts will constitute an invidious discrimination if it can be shown that "designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population." Fortson v. Dorsey, 379 U.S. at 439, 85 S.Ct. at 501, 13 L.Ed.2d 401. In its most recent pronouncement concerning the constitutionality of multi-member districts, the Supreme Court reaffirmed this principle. The case of Whitcomb v. Chavis, *supra*, involved a constitutional challenge to the multi-member state legislative districts in Marion County, Indiana (Indianapolis),

which has a population of 700,000 and a plurality voting system, but no provision for at-large candidates running from particular geographical subdistricts. The plaintiffs' case consisted primarily of proof that blacks in Indianapolis were concentrated in a ghetto area, that they had special interests in certain issues, that a disproportionately low percentage of legislators in the past ten years came from the ghetto, and that there was a high degree of political party control over the nomination of candidates and the voting patterns of the legislative delegation. On the basis of this evidence the Supreme Court concluded:

> "We are unprepared to hold that district-based elections decided by plurality vote are unconstitutional in either single- or multi-member districts simply because the supporters of losing candidates have no legislative seats assigned them."

403 U.S. at 160, 91 S.Ct. at 1878, 29 L.Ed.2d 363. Essentially, the Supreme Court determined that the plaintiffs in *Whitcomb* only established that the failure of the black ghetto to have legislative seats in proportion to its population was solely the result of political defeat at the polls rather than a built-in bias against blacks. Indeed, the Court held that

> "the fact that the number of ghetto residents who were legislators was not in proportion to ghetto population [does not] satisfactorily prove invidious discrimination *absent evidence and findings that ghetto residents had less opportunity than did other Marion County residents to participate in the political processes and to elect legislators of their choice.*"

403 U.S. at 149, 91 S.Ct. at 1872, 29 L. Ed.2d at 379 (emphasis supplied).

Before directing our attention to the evidence in the instant case, we think it important to detail the salient features of the Texas electoral system and their impact upon the black minority. Under the legislative plan enacted by the Legislative Redistricting Board,

725

Dallas County comprises a multi-member district with a population in excess of 1,300,000. Thus, Dallas County's multi-member district is approximately three times as large as a congressional district in Texas, almost twice the size of the multi-member district that the Supreme Court had before it in Whitcomb v. Chavis, and it has a population greater than that of fifteen states.[14] In addition, unlike the plurality system in Indiana, Texas has a strict "majority" requirement in the primary. Virtually unknown outside the South, the majority requirement has not escaped considerable criticism on both Fourteenth and Fifteenth Amendment grounds. *See* Evers v. State Board of Election Commissioners, S.D.Miss., 1971, 327 F.Supp. 640; Boineau v. Thornton, E.D.S.C. 1964, 235 F.Supp. 175. Whatever its constitutional status, it is clear that the majority system tends to strengthen the majority's ability to submerge a political or racial minority in a multi-member district. In combination with the majority requirement, there exists in the Texas political repertoire the "place" re-

quirement. In essence, each candidate must limit his candidacy, in either a primary or a final election, to a particular place on the ballot. Since the place requirement means absolutely nothing in terms of residence, its ultimate effect is to highlight the racial element where it does exist. Furthermore, in multi-member districts in Texas there exists no provision for at-large candidates running from particular geographical subdistricts. Thus, in Dallas County it is entirely possible for each and every one of the district's eighteen representatives to reside in the same apartment complex. Finally, we note that unlike the State of Indiana, Texas has a rather colorful history of racial segregation. There exist innumerable instances, covering virtually the entire gamut of human relationships, in which the State has adopted and maintained an official policy of racial discrimination against the Negro.[15] Indeed, even the Negro's right to vote and to participate in the electoral process has not remained untouched by the State's policy.[16] Therefore, it is not unlikely that Texas' use of multi-mem-

14. The Dallas County multi-member district has a greater population than the following states: Alaska (302,173); Delaware (548,104); Hawaii (769,913); Idaho (713,008); Maine (993,663); Montana (694,409); Nevada (488,738); New Hampshire (737,681); North Dakota (617,761); New Mexico (1,016,000); Rhode Island (949,723); South Dakota (666,257); Utah (1,059,273); Vermont (444,732); and Wyoming (332,416).

15. See, e. g., Beal v. Holcombe, 1951, 193 F.2d 384 (city ordinance setting aside public parks for the exclusive use of Negroes and providing that all other public parks were for the exclusive use of white people held unconstitutional); Tippins v. State, 1920, 86 Tex.Cr.R. 205, 217 S.W. 380 (holding that a complaint charging delinquency need not allege that a child is white or black because under the Texas Code of Criminal Procedure a separate place of confinement is provided for Negro delinquents); Strauss v. State, 1915, 76 Tex.Cr.R. 132, 173 S.W. 663 (upholding the constitutionality of a city ordinance making it unlawful for a white person and any Negro to have sexual intercourse with each other within the city

limits); In Re Gomez, Tex.Civ.App.1967, 424 S.W.2d 656 (holding unconstitutional a statute prohibiting the adoption of a white child by a Negro person or of a Negro child by a white person); Harvey v. Morgan, Tex.Civ.App.1954, 272 S.W. 2d 621 (criminal provision prohibiting any fistic combat, match, boxing, sparring or wrestling contest or exhibition between any person of the white race and any person of the Negro race held unconstitutional); O'Connor v. Dallas Cotton Exchange, Tex.Civ.App.1941, 153 S.W.2d 266 (plaintiff held to allege a cause of action when his wife was wrongfully excluded from a passenger elevator set apart for whites and compelled to ride in an elevator set aside for Negroes).

16. See, e. g., Nixon v. Herndon, 1926, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (holding unconstitutional a Texas statute prohibiting Negroes from participating in the Democratic party primary election). Indeed, as recently as 1966 the State of Texas required the payment of a poll tax in order to vote. In striking down the poll tax requirement, a federal court found that the tax had originally been imposed in 1902 for the purpose of disenfranchising

ber districts, taken in the entirety of Texas electoral laws and of Texas history, unconstitutionally infringes the voting rights of racial and political minorities in all Texas cities that are districted as multi-member. However, we find it unnecessary at this time to so hold, for we conclude that the Dallas plaintiffs have also shown that the use of a multi-member district in Dallas County violates the equal protection clause in accordance with the standards of proof enunciated in *Whitcomb*.

▆▆▆ In addition to the above factors, the Dallas plaintiffs have shown not only that the number of black community residents who have been legislators is not in proportion to ghetto residents, but also that the black community has been effectively excluded from participation in the Democratic primary selection process. As a factual matter, Negroes in Dallas County vote primarily for candidates of the Democratic party. Furthermore, we find that it is extremely difficult to secure either a representative seat in the Dallas County delegation or the Democratic primary nomination without the endorsement of the Dallas Committee for Responsible Government (hereinafter referred to as the DCRG). Furthermore, it has been shown that white candidates endorsed by the DCRG in either a primary or general election can win in a county-wide race without appealing to the Negro vote. Essentially, the plaintiffs have shown that the DCRG, without the assistance of black community leaders, decides how many Negroes, if any, it will slate in the Democratic primary.[17] The DCRG then informs some black community leaders of its decision and requests that those leaders select the Negro candidate. It is significant that the DCRG makes its decision with respect to how many Negro candidates it will slate, and not how many candidates it will slate who are sympathetic to the problems and interests of the black community. Thus, the facts clearly show that the Negro community in Dallas County participates in the selection of the Democratic primary candidates only in the recruiting process. But it is hardly adequate, for purposes of claiming effective participation, to say that the black community is consulted with respect to the sole black candidate placed on the DCRG slate. The requirement of effective participation can be answered only by showing that the interests of the black ghetto, like those of the white areas, are taken into consideration in the formulation of the entire slate. It is clear from the evidence in this case that such consideration never occurs. In essence, we find that the plaintiffs have shown that Negroes in Dallas County are permitted to enter the political process in any meaningful manner only through the benevolence of the dominant white majority. If participation is to be labeled "effective" then it certainly must be a matter of right, and not a function of grace.

Finally, we think that the record evinces a recurring poor performance on the part of the Dallas County delegation concerning the representation of black interests in the Texas House of Representatives. State legislators from Dallas County, elected county-wide, led the fight for segregation legislation during the decade of the 1950's. Indeed, the record reveals that during the late 1950's not one member of the Dallas County delegation voted against certain segregation measures introduced in the Texas House. Moreover, it has been shown that hostility toward the black community is still an integral part of Dallas County politics.[18] As recently as 1970, the DCRG

γ the Negro. United States v. State of Texas, W.D.Tex.1966, 252 F.Supp. 234, 245, affirmed 384 U.S. 155, 86 S.Ct. 1383, 16 L.Ed.2d 434.

17. Since the Reconstruction Era, there have been only two blacks from the Dallas County delegation to the Texas House of Representatives. In addition, these have been the only two blacks ever slated by the DCRG, and the first was not until 1966.

18. The record in *Whitcomb* showed that Indiana is the millenial society where race plays no part in politics. The *Whitcomb* record showed the following: There were

was relying upon racial campaign tactics in white precincts to defeat candidates who had the overwhelming support of the black community. So long as the organization that dominates the county-wide Democratic primary in Dallas County relies upon such a racial appeal to defeat black favored candidates, we think it highly unlikely that candidates elected on such a platform could seriously represent in the Texas Legislature the best interests of Dallas' black community.

We conclude that the Dallas plaintiffs have shown, in accordance with the standards laid down by the Supreme Court in the *Whitcomb* case, that a multi-member district in Dallas County tends to dilute or cancel out the vote of Dallas County's Negro minority. Accordingly, we hold the use of a multi-member district in Dallas County unconstitutional.

### IV.

The United States Supreme Court has long recognized that Chicanos, as well as Blacks, require the protective intervention of the Federal Courts:

"The State of Texas would have us hold that there are only two classes—white and Negro—within the contemplation of the Fourteenth Amendment. The decisions of this Court do not support this view.[4]

"4. See Truax v. Raich, 239 U.S. 33 [36 S.Ct. 7, 60 L.Ed. 131] ; Takahashi v. Fish and Game Commission, 334 U.S. 410 [68 S.Ct. 1138, 92 L.Ed. 1478] ; Cf. Hirabayashi v. United States, 320 U.S. 81, 100 [63 S.Ct. 1375, 87 L.Ed. 1774] : 'Distinctions between citizens

solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'

\* \* \* \* \* \*

"Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated. The Fourteenth Amendment is not directed solely against discrimination due to a 'two-class' theory —that is, based upon differences between 'white' and Negro." Hernandez v. Texas, 347 U.S. 475, at 478 (1954), 74 S.Ct. 667, at 670, 98 L.Ed. 866.

The existence of a recognizable Mexican-American minority is further evidenced by recent decisions of Federal Courts throughout the State. In Pablo Puente v. City of Crystal City, Texas, No. DR–70–CA–4 (April 3, 1970), the Court found that the real property ownership requirement incorporated in the Charter of Crystal City for candidates for city office was invidiously discriminatory against the Mexican-American Plaintiffs

incidents of public and private discrimination in Indianapolis in the late 19th and early 20th centuries, but the record shows none after 1926 ; Indiana has had a civil rights law since 1885, and enacted a new civil rights law in 1969 ; the election results show a strong two-party system, with votes cast along political party lines rather than racial lines, both in the ghetto area and elsewhere ; party nominations are made at primary elections, where those who have been "slated" by the party organization were invariably successful ;

the slating (at least for Democrats) is done at a convention of precinct chairmen, both black and white ; the success of party nominees almost invariably depends upon the success of the ticket ; blacks typically vote Democratic, and form a substantial part of the Democratic Party's strength ; the predominance of party discipline over race is shown by the 1968 general elections in which three blacks were elected on the Republican ticket county-wide but finished well *behind* white Democratic opponents in the ghetto.

728

and their class and hence was unconstitutional.

Concerning the Corpus Christi Independent School District in Nueces County, Texas, a Court ruled that Texas was segregating Mexican-American students (which were found to constitute a readily identifiable ethnic-minority group or class) in the public schools on the basis of race, color, or national origin. Cisneros v. Corpus Christi Independent School District, 324 F.Supp. 599 (S.D. Tex.1970).

The Court of Appeals for the Fifth Circuit has held that the record supported allegations that there had been discrimination in the selection of the Grand Jury in El Paso County, Texas that indicated the Mexican-American petitioner and that the State of Texas had failed to recognize the right of Mexican-American defendants to protest exclusion or under-representation of Mexican-Americans in the composition of Grand Jury and Petit Jury venires. Muniz v. Beto (5th Cir. 1970) 434 F.2d 697.

The most recent decision in this area resulted from a suit brought by Mexican-American Plaintiffs in the Edgewood Independent School District in Bexar County, Texas, a district of near-total Mexican-American enrollment. The Court found the Texas public school financing structure unconstitutional on grounds that the quality of a student's education should relate to the wealth of the State as a whole and not to an individual district's real property tax reserve. Rodriguez v. San Antonio Independent School District (W.D.Tex., 1971) 337 F.Supp. 280. Moreover, as stated in a scholarly note by Gerald M. Birnberg in the University of Texas Law Review, 49 Texas L.Rev. 337, 338 (1971), "The conclusion that ethnic isolation of Mexican-Americans in the public schools is unlawful should not be surprising, since that principle has long been established in Texas law." See generally Jesus Salvatierra v. Inhabitants of Del Rio Independent School District, 33 S.W.2d 790 (Tex.Civ.App.1930), appeal dismissed, w. o. j., and cert. denied, 284 U.S. 580, 52

S.Ct. 28, 76 L.Ed. 503 (1931); Delgado v. Bastrop Independent School District, Civ. No. 388 (W.D.Tex. June 15, 1948); Hernandez v. Driscoll Consolidated Independent School District, 2 Race Rel. L.Rev. 329 (S.D.Tex. January 11, 1957). 49 Tex.L.Rev. 337 (1971): In Cisneros, supra, at 607, 608, Judge Seals said:

". . . [I] It is clear to this Court that these people for whom we have used the word Mexican-Americans to describe their class, group, or segment of our population, are an identifiable ethnic minority in the United States, and especially so in the Southwest [and] in Texas . . . This is not surprising; we can notice and identify their physical characteristics, their language, their predominant religion, their distinct culture, and, of course, their Spanish surnames. And if there were any doubt in this court's mind, this court could take notice, which it does, of the congressional enactments, government studies and commissions on this problem."

324 F.Supp. at 607–608.

Because of long-standing educational, social, legal, economic, political and other widespread and prevalent restrictions, customs, traditions, biases and prejudices, some of a so-called de jure and some of a so-called de facto character, the Mexican-American population of Texas, which amounts to about 20%, has historically suffered from, and continues to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others.

In the words of a recent Texas Federal Court decision,

"Mexican-American students in the State of Texas are a cognizable ethnic group and, hence, many avail themselves of the protections afforded under the Fourteenth Amendment and under Title VI and the Mexican-American students in the Del Rio area have been subjected, over the years, to unequal treatment with respect to the ed-

ucational opportunities afforded them and are, thus, part of a so-called *de jure* dual school system based upon separation of students of different ethnic origins." United States v. Texas, 342 F.Supp. 24 (E.D.Tex. July 13, 1971)[18a]

Chief Judge Brown has said that "[I]n the problem of racial discrimination, statistics often tell much, and courts

[18a]. In the following language from Judge Roth's opinion in Bradley v. Milliken, 338 F.Supp. 582 (E.D.Mich.1971), Bexar County and Mexican-Americans may readily be substituted, respectively, for the City of Detroit and blacks :

"The City of Detroit is a community generally divided by racial lines. Residential segregation within the city and throughout the larger metropolitan area is substantial, pervasive and of long standing. Black citizens are located in separate and distinct areas within the city and are not generally to be found in the suburbs. While the racially unrestricted choice of black persons and economic factors may have played some part in the development of this pattern of residential segregation, it is, in the main, the result of past and present practices and customs of racial discrimination, both public and private, which have and do restrict the housing opportunities of black people * * *

"Governmental actions and inaction at all levels, federal, state and local, have combined, with those of private organizations, such as loaning institutions and real estate associations and brokerage firms, to establish and to maintain the pattern of residential segregation throughout the Detroit metropolitan area * * * The policies pursued by both government and private persons and agencies have a continuing and present effect upon the complexion of the community—as we know, the choice of a residence is a relatively infrequent affair. For many years FHA and VA openly advised and advocated the maintenance of 'harmonious' neighborhoods, *i. e.*, racially and economically harmonious. The conditions created continue. While it would be unfair to charge the present defendants with what other governmental officers or agencies have done, it can be said that the actions or the failure to act by the responsible school authorities, both city and state, were linked to that of these other governmental units. When we speak of governmental action we should not view the different agencies as a collection of unrelated units. Perhaps the most that can be said is that all of them, including the school authorities, are, in part, responsible for the segregated condition which exists. And we note

that just as there is an interaction between residential patterns and the racial composition of the schools, so there is a corresponding effect on the residential pattern by the racial composition of the schools.

\* \* \* \* \*

"As we assay the principles essential to a finding of de jure segregation, as outlined in rulings of the United States Supreme Court, they are :

1. The State, through its officers and agencies, and usually, the school administration, must have taken some action or actions with a purpose of segregation.

2. This action or these actions must have created or aggravated segregation in the schools in question.

3. A current condition of segregation exists.

We find these tests to have been met in this case. We recognize that causation in the case before us is both several and comparative. The principal causes undeniably have been population movement and housing patterns, but state and local governmental actions, including school board actions, have played a substantial role in promoting segregation. It is, the Court believes, unfortunate that we cannot deal with public school segregation on a no-fault basis, for if racial segregation in our public schools is an evil, then it should make no difference whether we classify it de jure or de facto. Our objective, logically, it seems to us, should be to remedy a condition which we believe needs correction. In the most realistic sense, if fault or blame must be found it is that of the community as a whole, including, of course, the black components. We need not minimize the effect of the actions of federal, state and local governmental officers and agencies, and the actions of loaning institutions and real estate firms, in the establishment and maintenance of segregated residential patterns—which lead to school segregation—to observe that blacks, like ethnic groups in the past, have tended to separate from the larger group and associate together. The ghetto is at once both a place of confinement and a refuge. There is enough blame for everyone to share."

listen." Alabama v. United States, 304 F.2d 583, 586 (5 Cir. 1962).

Bexar County, Texas contains areas of substantial Mexican-American concentration which are clearly defined geographically and which have the characteristics of slum areas because of common adverse conditions relating to family income, housing, educational attainment and other matters. This is particularly true of the area known as the West Side in the City of San Antonio.

The record reveals that the predominantly Mexican-American section of San Antonio (50% or greater) is included within 28 contiguous census tracts. In this area, also known as the Barrio, the average resident lives in the most seriously straitened and deprived circumstances. Mexican-Americans ("Chicanos") make up 78.54% of the population of the Barrio, which is 23.78% of the total population of Bexar County's population of 830,460. The Barrio includes 47.8% of the housing units in Bexar County valued at less than $5,000. Only 00.67% of the units valued at $50,-000 or more are located in the area. The average home cost in Bexar County is $13,500, whereas in the Barrio, the average cost is $8,807.14. These census tracts also contain 58.5% of the total dwelling units lacking some or all plumbing units, at an average contract rental of $51.86, as opposed to $86.00 for the county as a whole.

The 1960 census figures also disclose that the Barrio at that time included 65.43% of the Bexar County population who had never attended school and only 5.26% of the county's college graduates. Also, it embraced 73.04% of the Bexar County families with median incomes under $5,000, as contrasted with only 2.18% of the Bexar County families with median income over $25,000. Although Barrio laborers made up 29.55% of the county's labor force, 46.33% of the Bexar County unemployed work force lived there. (The 1970 census figures in this regard were not available at the time of trial.)

It has been suggested that because Chicanos constitute about half the population of Bexar County, they cannot be a politically deprived ethnic minority. Such a suggestion misconceives the meaning of the word "minority". In the context of the Constitution's guarantee of equal protection, "minority" does not have a merely numerical denotation; rather it refers to an identifiable and specially disadvantaged group. That Mexican-Americans in Texas are such a group is well-established. With regard to Mexican-American children, one Court recently held that:

> "these students react to or are affected by a given stimulus—the Anglo-oriented educational program such as that maintained in the former Del Rio Independent School District—in a similar and predictable manner and, in the opinion of a recognized expert, this reaction is based almost entirely on common characteristics which, incidentally, may be traced to their common and distinct ancestry." United States v. Texas, supra.

Consequently, in addition to the appalling conditions of poverty and its concomitants, most Chicano children in Texas face an often insurmountable cultural disorientation. The fact that they are reared in a sub-culture in which a dialect of Spanish is the primary language provides permanent impediments to their educational and vocational advancement and creates other traumatic problems. A "Report of the United States Commission on Civil Rights, March, 1970" (Plaintiff's exhibit, BI–12, p. 66) states that:

> "It is common in the Southwest, moreover, to find Mexican-Americans who speak Spanish in the home, with friends, on social occasions, and at work among other Mexican-Americans; they use English only as a second language when necessary. Many Mexican-Americans have enough familiarity with English to get along, but have more difficulty than the av-

erage layman in understanding Court-room proceedings and legal matters." In the "Summary" of this Report (Plaintiff's exhibit BI–13, p. 16) the Commission concludes that Mexican-Americans in the Southwest have a language disability that seriously interferes with their relations with agencies and individuals responsible for the administration of justice. This results in an inability to communicate with police officers, probation and parole officers, their own attorneys in civil and criminal matters, and in other legal proceedings. Certainly, this language barrier is a *raison d'tre* for the Mexican-Americans label: "The Invisible Minority".

■■■ There is no aspect of human endeavor, in general and of American life in particular, in which the ability to read, write and understand a language is more important than politics. It should come as no surprise, then, to discover that Mexican-American participation in the political process of Bexar County is markedly deficient. Of course, there are many types of political alienation, and mere lack of participation by a particular group in the political process does not necessitate corrective action. But, just as Courts have drawn appropriate and necessary inferences from the absence of Mexican-Americans from jury venires, *Hernandez and Muniz*, supra, so they must regarding political participation.

There can be no doubt that lack of political participation by Texas Chicanos is affected by a cultural incompatibility which has been fostered by a deficient educational system. If this court ignores the reason for the minimal impact of Mexican-Americans on Bexar County legislative elections, "it will prove that justice is both blind and deaf". Sims v. Baggett, supra, 247 F.Supp. at 109. See also Sims v. Ames, supra.

This cultural and language impediment, conjoined with the poll tax and the most restrictive voter registration procedures in the nation [19] have operated to effectively deny Mexican-Americans access to the political processes in Texas even longer than the Blacks were formally denied access by the white primary.

In Bexar County, Texas securing the Democratic Party nomination for the Texas House of Representatives has been tantamount to election since no Republican has been elected to said House from Bexar County from 1880 to the present. In Bexar County, there is presently no formalized process by which the Democratic Party slates candidates in party primary elections for the Texas House of Representatives. The population of the West Side of San Antonio tends to vote overwhelmingly for Mexican-American candidates when running against Anglo-Americans in party primary or special elections, to split when Mexican-Americans run against each other, and to support the Democratic Party nominee regardless of ethnic background in the general elections. The record shows that the Anglo-Americans tend to vote overwhelmingly against Mexican-American candidates except in a general election when they tend to vote for the Democratic Party nominee whoever he may be although in a somewhat smaller proportion than they vote for Anglo-American candidates.

The cost of conducting electoral campaigns in countywide races in Bexar County is so excessive that this factor alone has inhibited the recruitment and nomination or election of Mexican-American candidates for the Texas House of Representatives. Reports of election expenses reveal that Anglo-American candidates for State Representative spent two to three times as much as Chicano candi-

19. See Breare v. Smith, 321 F.Supp. 1100 (S.D.Tex.1971). See also Garza v Preston Smith, 320 F.Supp. 131 (W.D.Tex. 1971) in which the Court declared unconstitutional Articles 5.05(15) and 8.13 of the Texas Election Code as violative of the Equal Protection clause of the Fourteenth Amendment insofar as said articles forbade assistance to illiterate voters while granting such assistance to physically disabled and blind voters.

dates, and that contributions were heavily in favor of Anglo candidates.

Only four residents of the Barrio have run for the Texas House of Representatives since 1880, one in 1900 and the remainder since 1960. Of this number, two were Chicanos, one a Black, and the other an Anglo-American. And since 1880 only a total of five Mexican-Americans have served in the Texas Legislature from Bexar County.

 An Anglo member of the House of Representatives from Bexar County was unable to identify any piece of legislation sponsored by any member of the Bexar County delegation at the last session of the Legislature to relieve or remedy the adverse conditions extant in the West Side. Of course, the Court in *Whitcomb,* supra, stated:

> "Nor does the fact that the number of ghetto residents who were legislators was not in proportion to ghetto population satisfactorily prove invidious discrimination absent evidence and findings that ghetto residents had *less opportunity* than did other Marion County residents *to participate* in the political process and to elect legislators of their choice." (Emphasis added.)

Naturally, this Court fully accepts Justice White's evaluation, but we note that he did correctly indicate that such facts, taken in conjunction with others, would be persuasive. It is not suggested that minorities have a constitutional right to elect candidates of their own race, but elections in which minority candidates have run often provide the best evidence to determine whether votes are cast on racial lines. All these factors confirm the fact that race is still an important issue in Bexar County and that because of it, Mexican-Americans are frozen into permanent political minorities destined for constant defeat at the hands of the controlling political majorities.

In *Kramer,* supra, 395 U.S. at 626, 89 S.Ct. at 1889, 23 L.Ed.2d 583, the Court held that:

> "Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials, undermines the legitimacy of representative government."

Just as the Court has invalidated "grandfather clauses", Lane v. Wilson, 307 U.S. 268 at 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939), so it has disapproved "the ghost of past malapportionment", *Burns,* infra 384 U.S. at 93, 86 S.Ct. at 1297, 16 L. Ed.2d 376. Likewise, when a minority group is invidiously disadvantaged by the concomitance of poverty, past and continuing discrimination, a restrictive electoral system, and a peculiar districting scheme,[20] which gives it "less opportunity" to participate successfully, the Court will void such an apportionment scheme. *Cf. Hadley,* supra, at 57, 90 S. Ct. 791, 25 L.Ed.2d 45. See generally Gaston v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969). It must be recognized that the right to vote may be abridged as easily by making its exercise excessively difficult as by prohibiting its exercise entirely. The Constitution forbids "sophisticated as well as single-minded modes of discrimination". Gomillion v. Lightfoot, 364 U. S. 339 at 342, 81 S.Ct. 125 at 127, 5 L. Ed. 110 (1960). *Cf.* Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

20. The overlay of a designated, but not geographically based, place system, which it is generally conceded enables politically active majorities to gang up on politically inactive minorities by eliminating the single-shot voting possible in the usual at large system—on a majority run-off requirement in the multi-member districts. See Speech by Preston W. Edsall, "State Legislatures and Legislative Representation," the Presidential address delivered at the Annual Meeting of the Southern Political Science Association held in New Orleans, La. on November 2, 3 and 4, 1967; and Roy E. Young, "The Place System in Texas Elections," published by the Institute of Public Affairs, University of Texas, Austin, Texas, 1965, Series No. 62.

■ The principal distinctions between the Dallas minority, the blacks, and the San Antonio minority, the Mexican-Americans, are in two areas: first, the Mexican-Americans of San Antonio are in plurality in terms of their numerical percentage of the population of Bexar County, and second, the Mexican-Americans of San Antonio register and vote at very low rates, approximately 30%. It has been argued that the facts of numerical majority and of low voting participation indicate that the Mexican-Americans are not entitled to constitutional relief, since they "could" do very well in multi-member district elections in Bexar County. We reject those arguments.

*Whitcomb* speaks of a "minority", and we see no need to limit that to numerical minority. In fact, "minority" has traditionally been used in Civil Rights cases to denote a racial or social group of people, not a numerical percentage. Therefore, the Mexican-Americans of San Antonio are not read out of *Whitcomb* simply because their numbers may predominate over those of the Anglos. They still fall within the rationales of *Whitcomb*.

In addition, we draw very different conclusions than does the State from the fact that the Mexican-Americans register and vote in such low numbers. The State uses those facts to argue that the Mexican-Americans need political organization, not redistricting. We use those facts in the context of the other facts regarding the Mexican-Americans of San Antonio that we have previously discussed. And we conclude that the *reason* that the voter participation among the Mexican-Americans is so low is that their voting patterns were established under precisely the same sort of discriminatory State actions that we have already found both relevant and condemnatory with regard to the Dallas Blacks. The fact that some of those laws have been changed within the past few years or months does not answer or offset the fact that the voting patterns remain firm. Because they were denied access to the political processes through years

of discrimination, the Mexican-Americans do not now register and vote in overwhelming numbers. We are not at all surprised at that result. Nor do we feel constitutionally able to respond, as does the State, that the Mexican-Americans should be left to the tool of political organization in order to remedy their electoral situation in San Antonio and to exert more influence in multi-member elections in Bexar County. The voting patterns and the language difficulties, which we have already concluded were caused or abetted by State action, have made the process of organization extremely onerous, if not illusive.

There is no constitutional requirement that the Mexican-Americans go through the decades of organization and heartache that preceded the black Civil Rights movement and the resulting increase in black participation in the political processes. Quite the contrary, while State action unquestionably caused or contributed substantially to the low voter participation of the Mexican-Americans in San Antonio, the remedying of State action is both appropriate and constitutionally compelled. The fact that the State action at issue here, the apportionment of Bexar County, did not "cause" the low voter participation is questionable argument and an irrelevant one. Because of the continued and continuing discriminations against Mexican-Americans in Bexar County, they are effectively removed from the political processes of Bexar in violation of all the *Whitcomb* standards, whatever their absolute numbers may total in that County.

■ Single-member representation in Bexar is as constitutionally compelled as is single-member representation in Dallas, on the basis of *Whitcomb*, although for somewhat different rationale and under somewhat different circumstances. Single-member districts in San Antonio will obviously be of benefit in remedying the effects of past and present discrimination against Mexican-Americans. If the voting percentages remain at 30% in the Mexican-American areas, for a short while after single-mem-

ber districting, at least the Mexican-Americans will have representation of their interests in the Texas House. Moreover, we are also of the opinion that the opportunity to participate effectively in the political process will greatly encourage the voting percentages in the Mexican-American areas of Bexar.

 Again, we are not to be understood as saying, and indeed specifically disavow, any intention of implying that

> "any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a single member district." *Whitcomb,* supra, 403 U.S. at 156, 91 S.Ct. at 1875, 29 L.Ed.2d 363.

No political, racial or other interest group has any constitutional right to be successful in its political activities. However, a State may not design a system that deprives such groups of a reasonable chance to be successful.

## V.

 The San Antonio Republicans assert that the State Senate Districts in Bexar County have been unlawfully gerrymandered. Specifically, they argue that the legislative redistricting board designed Senatorial Districts 19, 21, and 26 for the purpose of minimizing the Republicans' political clout. We are unable to agree with this contention.

In Bexar County the three state senatorial posts are presently filled by two Anglos and one Mexican-American. Under the board's redistricting plan, Senatorial District 21 combines approximately 110,000 people from the northern portion of Bexar County with approximately 250,000 people from rural counties north, west, and south of Bexar County. The State demonstrated that a division was necessary in order to achieve numerical equality in the various senatorial districts. While the San Antonio Republicans do not challenge the State's quest for population equality among the various senatorial districts, they do object

to the method employed by the State in adhering to the one-man, one-vote principle. Essentially, the Republicans in San Antonio claim that those 110,000 bodies combined with other South Texas counties in Senatorial District 21 should have been extricated from the southern portion of Bexar County.

This Court is unable to conclude that there is some constitutional preference for a district shaped like a horseshoe as opposed to one shaped like a doughnut. Indeed, there seems little to dictate a choice between what was done and what could have been done concerning the senatorial districts in Bexar County. The State has shown that its choice is relatively consistent with traditional redistricting criteria. All three of the senatorial districts representing at least a portion of Bexar County follow the principles of contiguity. In addition, these three districts are relatively compact, and the fact that another redistricting plan might have created districts which were arguably more compact is not sufficient to justify judicial denunciation of the existing plan. Accordingly, we conclude that the San Antonio Republicans have failed to prove an unlawful gerrymander with respect to the senatorial districts in Bexar County, Texas.

## VI.

The plaintiff in Harris County contends that the state redistricting board has districted Harris County's senatorial seats in such a way that the effect is to minimize or dilute Harris County's black vote. In addition, the Harris County plaintiff alleges that the intent of the redistricting board was to dilute the black vote.

 Of course, whenever a single-member districting scheme is employed in a metropolitan area, it is essential that some divisions be made. The Supreme Court cases are unclear concerning the question of whether it is the *effect* of a redistricting scheme or the *intent* of the redistricting body that controls the Fourteenth Amendment in-

quiries of a judicial tribunal. *See generally*, Palmer v. Thompson, 1971, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438. We feel compelled to conclude from *Whitcomb* that effect—that is, the established effect of a lesser impact on black voters under one scheme as contrasted with another—is not sufficient alone to invalidate a districting scheme under the Fourteenth Amendment. And intent—if by intent one means only an established, specific purpose—is usually very difficult to demonstrate; racial motives are rarely stated openly nowadays. Of course, a court may draw differences in *degree* between the effects of a districting scheme, or a court may *infer* intent from particular effects within a *congeries* of historical circumstance. But in such a situation whether a court uses "effect" or "intent" as the basis for judicial inquiry, we believe that a court must find, before concluding that a single-member districting scheme violates the Fourteenth Amendment, that the effects are indeed substantial, if not egregious. From the record presented to this Court a majority is simply unable to conclude that even the effect of the challenged redistricting scheme in Harris County will be to dilute the votes of the black minority. The racial composition of the various districts in Houston has changed very little, if at all. Indeed, State Senator Barbara Jordan, a Black, testified that she would not concede that she could not win from the new senatorial district because she believed that she could appeal to a broad base of the voters. In addition, to remedy the alleged racial effect of the board's plan, we have been offered one plan that openly "gerrymanders" (in the historical sense of that word) Harris County so as to maximize black voting clout, a proposal strictly forbidden by the Fourteenth Amendment, *see* Wright v. Rockefeller, 1964, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512, (Douglas, J., dissenting), and another plan which, if acceptable in other respects, would increase the black percentage in one district by only five percentage points.

Furthermore, we cannot read invidious racial intent by the legislative redistricting board into the fact that the board may have taken the racial composition of the various districts into consideration in drawing its plan. It appears to a majority of this Court that, in order *not* to dilute the votes of a racial minority as required by the Fourteenth Amendment, *see* Whitcomb v. Chavis, *supra*; Fortson v. Dorsey, *supra*; Burns v. Richardson, *supra*, the body charged with drawing district lines is within its rights to have before it information on racial composition.

Absent preponderating evidence, this Court can only conclude that the plaintiff in the Harris County case has failed to show that Harris County's single-member senatorial districts either operate or were designed to dilute the vote of that county's black minority.

## VII.

This Court concludes that the apportionment plan for the State of Texas is unconstitutional as unjustifiably remote from the ideal of "one man, one vote", and that the multi-member districting schemes for the House of Representatives as they relate specifically to Dallas and to Bexar Counties are unconstitutional in that they dilute the votes of racial minorities. The panel does not feel compelled to reach the question of the alleged dilution of "political" elements in the apportionment of the House of Representatives as raised by the Republicans of Dallas and Bexar Counties on the ground that the interests of and the relief asked by the Republicans are automatically subsumed in the relief granted to Dallas and Bexar Counties in behalf of the black and Mexican-American minorities. The Court is unanimously of the opinion that the Senate districting scheme for Bexar County does not unconstitutionally dilute the votes of any political faction or party. The majority is unable to conclude that the black votes of Harris County have been unconstitutionally diluted.

The Supreme Court and the Federal Judiciary have entered the field of legislative apportionment only with hesitation and only to correct constitutional defects. Apportionment remains essentially a legislative function, and this Court feels neither required nor inclined to assume that legislative duty at this point. Although we conclude that the legislative redistricting plan fashioned by the five-member redistricting board is constitutionally infirm, our commitment to federalism is such that we remit to the State legislative processes the opportunity to perform its functions of redistricting. Therefore, the matter of redistricting the State in accordance with the constitutional guidelines explicated in this opinion is rendered for legislative consideration and resolution. See Reynolds v. Sims, supra.[21] But while it is appropriate for the Federal Courts to enter the apportionment area with restraint, they cannot appropriately maintain a Job-like unquestioning and unswerving patience with the legislative processes in the realm of the Federal Constitution.[22] The next regular session of the Texas Legislature will convene in January of 1973. If the legislature has not acted pursuant to constitutional guidelines by July 1, 1973, this Court will feel compelled by the Fourteenth Amendment and the evolving law of apportionment to redistrict the State itself. See Sims v. Amos, supra.

■ It is established law in this area that a Court may act either temporarily or permanently and that it may act to remedy only specific sections of a State apportionment plan. See Reynolds v. Sims, supra; Whitcomb v. Chavis, supra. In particular, we conclude that this Court should act immediately on those areas of a State apportionment plan which it finds to be egregiously out of line with constitutional requirements. See Wells v. Rockefeller, supra. This requirement of immediate action would arise primarily in the context of racial inequalities or hinderances. See Connor v. Johnson, supra; Sims v. Amos, supra.

■ This Court has concluded that particularly compelling constitutional infirmities have presented themselves in Dallas and Bexar Counties, founded in the context of racial inequalities and hinderances. Because the use of multi-member districting in Dallas and Bexar is the basis of our holdings of unconstitutionality and because a Federal Court engaged itself in the apportionment process must give preference to single-member districting, Connor v. Johnson, supra, this Court hereby adopts the single-member districting plans that are appended to this opinion as Exhibits A and B. These plans were adopted from among those presented to the Court by six different sources (with some adjustments by the Court) solely on the basis of the least population variance.[23] We are unanimously of the opinion that they fulfill the constitutional requirements of *Whitcomb* and of *Reynolds*.

■ This Court is also of the opinion that one of the equities of transition from multi-member districts in Dallas and Bexar Counties to single-member districts requires that, for the election to the Texas House of Representatives to be held during the year of 1972, no candidate shall be required to reside in the single-member district he seeks to represent; enforcement of and the requirement of the Texas Constitution so stating will be enjoined for the year of 1972. Such candidates must, however, reside in Dallas or Bexar Counties.

---

21. We should note that this Court has been offered a substitute plan by one of the plaintiffs which results in a total deviation for the State of less than 3.5%, while cutting only 23 county lines. Although that plan may be defective in other ways, which we have neither studied conclusively nor do we reach in this opinion, the proposed plan clearly indicates that a much closer proximation of *Reynolds* and *Swann* can be achieved.

22. See Kilgarlin v. Hill, supra; Smith v. Craddick, supra; Mauzy v. Redistricting Board, supra.

23. The total deviation of Exhibit A (Dallas) is 1.4% (1048); the total deviation of Exhibit B (Bexar) is 1.9% (1402).

## ORDER

Pursuant to the opinion entered this day in the above styled and numbered cause, the following mandate shall issue forthwith.

It is hereby ordered that unless the Legislature of the State of Texas on or before July 1, 1973, has adopted a plan to reapportion the legislative districts within the State in accordance with the constitutional guidelines set out in this opinion this Court will so reapportion the State of Texas.

It is further ordered that the counties of Dallas and Bexar are hereby reapportioned into single-member representative districts in conformance with appended Exhibits A and B, respectively.

It is further ordered that Article 3, Section 7 of the Constitution of the State of Texas, as pertains to the one-year district residence requirement for State Representatives is hereby suspended for those candidates for the Texas House of Representatives from Dallas and Bexar Counties in the 1972 primary, general and special elections. However, said Article 3, Section 7 shall remain in full force and effect as concerns those candidates for State Representative seeking election in Representative District 45, which has not been specifically reapportioned under this Order.

It is further ordered that the Secretary of State of the State of Texas adopt and implement any and all procedures necessary to properly effectuate the orders of this Court in conformance with this Opinion, the Texas Election Code, and the Constitution of the State of Texas.

The Court further orders that any and all relief requested by the parties and not specially granted in this Order is hereby in all things denied.

It is further ordered that this judgment be considered, for purposes of appeal and otherwise, as a final judgment in this case, and that no stay of proceedings pending appeal will be granted by this Court.

[See following illustrations]

EXHIBIT A

DISTRICT___33A_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 143 (less Block 7 & 8) | 16,923 |
| 144 (all except E.D. 69, 70, 82 and 82B) | 8,090 |
| 145 | 7,142 |
| 146 | 6,353 |
| 147 | 7,157 |
| 148 | 3,366 |
| 149 | 2,564 |
| 150 | 5,424 |
| 151 | 7,681 |
| 152 | 8,995 |
| TOTAL | 73,695 |

DISTRICT___33B_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 72 (Blocks 2 & 3 only) | 2,702 |
| 97 (Blocks 3,4 & 5 only) | 4,470 |
| 99 | 3,236 |
| 136.01 | 1,649 |
| 137.01 | 4,561 |
| 137.02 | 7,303 |
| 137.03 | 6,797 |
| 137.04 | 52 |
| 137.05 | 39 |
| 138.01 | 284 |
| 138.02 | 9,623 |
| 139 | 8,439 |
| 140.01 | 4,283 |
| 140.02 | 314 |
| 141.01 | 1,735 |
| 141.02 | 391 |
| 141.03 | 44 |
| 141.04 | 7,890 |
| 142 | 3,873 |
| 143 (Blocks 7 & 8 only) | 6,027 |
| TOTAL | 73,712 |

DISTRICT___33C_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 4.01 | 2,893 |
| 4.02 | 5,647 |
| 4.03 | 6,509 |
| 5 | 4,582 |
| 16 | 6,007 |
| 17.01 | 316 |
| 17.02 | 3,103 |
| 18 | 2,657 |
| 19 | 1,447 |
| 21 | 200 |
| 22.01 | 1,669 |
| 22.02 | 2,265 |
| 23 | 2,553 |
| 25 (Blocks 3 & 4 only) | 2,304 |
| 28 | 2,523 |
| 29 | 3,778 |
| 30 | 649 |
| 31.01 | 2,465 |
| 31.02 | 56 |
| 32.01 | 377 |
| 33 | 3,277 |
| 36 (Block 1 only) | 710 |
| 71.02 | 7,662 |
| 100 | 3,665 |
| 102 | 6,511 |
| TOTAL | 73,825 |

DISTRICT___33D_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 181.01 | 5,624 |
| 181.02 | 2,566 |
| 181.03 | 5,418 |
| 182 | 12,170 |
| 183 | 7,842 |
| 184 | 7,635 |
| 186 | 4,305 |
| 187 | 4,982 |
| 188 | 5,244 |
| 189 | 3,810 |
| 190.05 (less E.D. 220) | 14,257 |
| TOTAL | 73,853 |

DISTRICT___33E_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 2.01 Block 1 | 1,050 |
| 3 | 3,616 |
| 6.01 | 5,727 |
| 6.02 | 7,897 |
| 10 | 4,799 |
| 71.01 | 2,339 |
| 73.01 | 2,462 |
| 73.02 | 4,049 |
| 75.02 | 469 |
| 79.01 | 7,769 |
| 193.01 | 2,549 |
| 193.02 | 6,667 |
| 194 | 3,753 |
| 195.01 | 6,194 |
| 195.02 | 4,335 |
| 196 | 2,597 |
| 197 | 2,716 |
| 198 | 4,820 |
| TOTAL | 73,808 |

DISTRICT___33F_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 43 | 3,785 |
| 44 | 6,519 |
| 45 | 7,263 |
| 46 | 2,815 |
| 52 | 3,820 |
| 53 | 5,388 |
| 64 | 5,979 |
| 65 | 6,345 |
| 67 | 3,207 |
| 68 | 4,475 |
| 69 | 1,943 |
| 101 | 11,332 |
| 103 | 4,754 |
| 104 | 2,695 |
| 199 | 3,515 |
| TOTAL | 73,835 |

DISTRICT___33G_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 51 (less Block 1) | 2,400 |
| 56 | 5,095 |

[A5675]

DISTRICT____33G_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 57 | 7,381 |
| 59.01 | 8,261 |
| 59.02 | 4,326 |
| 60.01 | 4,618 |
| 60.02 | 2,517 |
| 61 | 4,788 |
| 62 | 4,588 |
| 63.01 | 4,568 |
| 63.02 | 2,230 |
| 87.02 (Blocks 2,3,5,6 & 7) | 7,855 |
| 108 | 15,025 |
| TOTAL------- ----- | 73,652 |

DISTRICT____33H_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 116 (less Blocks 1 & 2) | 6,046 |
| 165.02 | 6,632 |
| 165.03 | 6,605 |
| 165.04 | 590 |
| 165.05 | 2,274 |
| 166.01 | 3,400 |
| 166.02 | 4,189 |
| 166.03 | 3,241 |
| 166.04 | 538 |
| 167.02 | 5,819 |
| 168 | 6,107 |
| 169.01 | 3,189 |
| 169.02 | 1,876 |
| 169.03 | 3,035 |
| 169.04 | 555 |
| 170 | 7,957 |
| 171 | 4,412 |
| 172 | 3,347 |
| 173.01 | 3,894 |
| TOTAL--------------- | 73,706 |

DISTRICT____33I_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 120 | 2,536 |
| 121 | 242 |
| 126 | 5,374 |
| 127 | 8,366 |
| 173.02 | 2,686 |
| 174 | 3,923 |
| 175 | 2,600 |
| 176.01 | 6,615 |
| 176.02 | 2,559 |
| 177 | 10,056 |
| 178.01 | 5,265 |
| 178.02 | 8,436 |
| 179 | 5,595 |
| 180 | 8,446 |
| 181.04 | 901 |
| TOTAL-------------73,600 | |

DISTRICT____33J_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 105 | 3,899 |
| 106 | 5,931 |
| 107 | 6,485 |
| 144 (E.D. 69,70,82 & 82B) | 2,559 |
| 153.01 | 2,180 |
| 153.02 | 4,649 |

DISTRICT____33J____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 154 | 7,807 |
| 155 | 3,455 |
| 156 | 4,494 |
| 157 | 3,304 |
| 158 | 2,617 |
| 159 | 2,496 |
| 160 | 6,215 |
| 161 | 2,953 |
| 162 | 6,543 |
| 163 | 1,750 |
| 164 | 4,393 |
| 165.01 | 2,092 |
| TOTAL-------------73,822 | |

DISTRICT____33K____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 7.01 | 3,363 |
| 7.02 | 2,743 |
| 8 | 4,787 |
| 9 | 3,123 |
| 11.01 | 4,132 |
| 11.02 | 2,401 |
| 12 | 4,727 |
| 13.01 | 1,956 |
| 13.02 | 5,092 |
| 14 | 3,803 |
| 15.01 | 6,863 |
| 15.02 | 3,925 |
| 24 | 2,440 |
| 25 (less Blocks 3 & 4) | 2,433 |
| 26 | 1,798 |
| 27.01 | 7,267 |
| 27.02 | 4,914 |
| 38 (less Block 5) | 3,385 |
| 39.01 | 4,583 |
| TOTAL------------73,735 | |

DISTRICT____33L_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 84 | 6,263 |
| 85 | 3,299 |
| 90.01 | 1,186 |
| 90.02 | 4,250 |
| 91.01 | 5,410 |
| 91.02 | 8,818 |
| 92.01 | 5,429 |
| 92.02 | 4,747 |
| 93.01 | 3,671 |
| 93.02 | 7,429 |
| 115 | 6,782 |
| 116 (Blocks 1 & 2) | 1,922 |
| 117 | 7,818 |
| 118 | 3,536 |
| 119 | 3,123 |
| TOTAL------------73,683 | |

DISTRICT____33M_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1 | 3,795 |
| 2.01 (less Block 1) | 2,085 |
| 2.02 | 3,908 |
| 79.02 (less Block 6) | 5,078 |

[A5676]

DISTRICT____33M_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 80 | 5,920 |
| 81 | 6,979 |
| 82 | 5,064 |
| 83 | 1,650 |
| 122.01 | 12,213 |
| 122.02 | 4,249 |
| 123 | 7,048 |
| 124 | 6,860 |
| 125 | 8,956 |
| TOTAL--------------- | 73,805 |

DISTRICT____33N_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 36 (except Block 1) | 1,124 |
| 37 | 5,855 |
| 38 (Block Group 5 only) | 1,490 |
| 39.02 | 3,756 |
| 40 | 3,794 |
| 86 | 4,121 |
| 87.01 | 4,979 |
| 87.02 (all except Blocks 2,3,5,6 & 7) | 5,619 |
| 109 | 1,327 |
| 110 | 10,217 |
| 111.01 | 1,933 |
| 111.02 | 11,667 |
| 112 | 3,571 |
| 113 | 4,844 |
| 114.01 | 4,507 |
| 114.02 | 1,740 |
| 167.01 | 3,237 |
| TOTAL--------------- | 73,781 |

DISTRICT____33o_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 20 | 6,306 |
| 32.02 | 209 |
| 33 | 1,854 |
| 34 | 6,950 |
| 41 | 3,585 |
| 42 | 4,638 |
| 47 | 3,134 |
| 48 | 3,718 |
| 49 | 7,597 |
| 50 | 3,035 |
| 51 (Block 1 only) | 1,232 |
| 54 | 7,076 |
| 55 | 4,048 |
| 88 | 12,279 |
| 89 | 8,073 |
| TOTAL--------------- | 73,734 |

DISTRICT____33P_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 136.02 | 7,639 |
| 136.03 (Less Block 2) | 8,332 |
| 190.01 | 937 |
| 190.02 | 4,085 |
| 190.04 | 4,295 |
| 190.05 (E.D. 220 only) | 369 |
| 190.06 | 216 |
| 190.07 | 895 |
| 191 | 6,106 |

DISTRICT____33P_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 192.01 | 4,718 |
| 192.02 | 5,058 |
| 192.03 | 5,713 |
| 192.04 | 6,482 |
| 192.05 | 3,065 |
| 192.06 | 6,241 |
| 192.07 | 9,555 |
| TOTAL--------------- | 73,706 |

DISTRICT____33Q_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 77 | 5,795 |
| 78.01 | 894 |
| 78.02 | 6,633 |
| 78.03 | 7,107 |
| 79.02 (Block 6 only) | 824 |
| 128 | 9,238 |
| 129 | 5,330 |
| 130.01 | 13,877 |
| 130.02 | 9,724 |
| 131 | 7,755 |
| 133 | 2,057 |
| 185.01 | 3,718 |
| 185.02 | 92 |
| 190.03 | 553 |
| TOTAL------------- | 73,597 |

DISTRICT____33R_____

PART OF DALLAS COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 72 (less Blocks 2 & 3) | 2,101 |
| 74 | 1,697 |
| 75.01 | 739 |
| 76.01 | 2,302 |
| 76.02 | 812 |
| 76.03 | 842 |
| 76.04 | 3,693 |
| 94 | 7,036 |
| 95 | 2,492 |
| 96.01 | 12,178 |
| 96.02 | 8,696 |
| 96.03 | 4,756 |
| 96.04 | 2,205 |
| 97 (less Blocks 3,4, & 5) | 4,237 |
| 98 | 9,262 |
| 132 | 2,217 |
| 134.01 | 1,165 |
| 134.02 | 1,504 |
| 135 | 2,898 |
| 136.03 (Block 2 only) | 2,940 |
| TOTAL------------- | 73,772 |

L E G E N D

| Exhibit A District No. | Map District No. |
|---|---|
| 33A | 1 |
| 33B | 2 |
| 33C | 3 |
| 33D | 4 |
| 33E | 5 |
| 33F | 6 |
| 33G | 7 |
| 33H | 8 |

[A5677]

L E G E N D

PART OF BEXAR COUNTY:

| Exhibit A District No. | Map District No. | CENSUS TRACT | POPULATION |
|---|---|---|---|
| 33I | 9 | 1314 | 505 |
| 33J | 10 | 1315 | 3,581 |
| 33K | 11 | 1316 | 2,475 |
| 33L | 12 | 1317 | 5,329 |
| 33M | 13 | 1318 | 3,078 |
| 33N | 14 | 1413 | 2,158 |
| 33O | 15 | 1417 | 1,362 |
| 33P | 16 | 1418 | 1,884 |
| 33Q | 17 | 1419 | 1,717 |
| 33R | 18 | 1519 | 3,191 |
| | | 1522 | 1,992 |

TOTAL -------- 75,741

EXHIBIT B

DISTRICT ___57A___

PART OF BEXAR COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1511 | 8,325 |
| 1521 | 1,513 |
| 1608 | 4 |
| 1609 | 8,419 |
| 1610 | 3,799 |
| 1611 | 4,914 |
| 1613 | 1,393 |
| 1614 | 22,867 |
| 1615 | 10,475 |
| 1617 | 1,042 |
| 1618 | 4,830 |
| 1619 | 3,439 |
| 1620 | 4,323 |

TOTAL --------- 75,343

DISTRICT ___57B___

PART OF BEXAR COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1411 | 7,524 |
| 1415 | 1,219 |
| 1416 | 256 |
| 1505 | 11,251 |
| 1506 | 5,515 |
| 1507 | 6,116 |
| 1508 | 1,428 |
| 1509 | 6,314 |
| 1510 | 3,985 |
| 1512 | 2,622 |
| 1513 | 6,446 |
| 1514 | 4,276 |
| 1515 | 2,605 |
| 1516 | 6,663 |
| 1517 | 6,837 |
| 1518 | 1,573 |
| 1520 | 353 |
| 1612 | 568 |

TOTAL ------- 75,551

DISTRICT ___57C___

PART OF BEXAR COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1205 | 14,257 |
| 1213 | 3,534 |
| 1214 | 5,316 |
| 1215 | 655 |
| 1216 | 5,938 |
| 1217 | 5,054 |
| 1310 | 5,376 |
| 1312 | 2,384 |
| 1313 | 5,955 |

DISTRICT ___57D___

PART OF BEXAR COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1104 | 2,674 |
| 1303 | 3,999 |
| 1311 | 4,112 |
| 1401 | 2,237 |
| 1402 | 3,739 |
| 1403 | 3,143 |
| 1404 | 3,586 |
| 1405 | 3,682 |
| 1406 | 2,337 |
| 1407 | 3,904 |
| 1408 | 5,459 |
| 1409 | 1,941 |
| 1410 | 2,584 |
| 1412 | 6,925 |
| 1414 | 10,097 |
| 1501 | 6,959 |
| 1502 | 1,696 |
| 1503 | 5,674 |

TOTAL --------- 74,753

DISTRICT ___57E___

PART OF BEXAR COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1101 | 3,275 |
| 1102 | 1,816 |
| 1103 | 6,290 |
| 1109 | 1,332 |
| 1110 | 3,586 |
| 1201 | 10,561 |
| 1202 | 5,523 |
| 1301 | 5,508 |
| 1302 | 2,181 |
| 1304 | 8,572 |
| 1305 | 7,539 |
| 1306 | 5,846 |
| 1307 | 3,490 |
| 1308 | 5,643 |
| 1309 | 3,695 |

TOTAL ------ 74,857

DISTRICT ___57F___

PART OF BEXAR COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1203 | 6,933 |
| 1204 | 5,225 |
| 1206 | 6,023 |
| 1207 | 8,017 |
| 1208 | 7,592 |

[A5678]

DISTRICT ___57F___

PART OF BEXAR COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1209 | 4,970 |
| 1210 | 5,150 |
| 1211 | 2,871 |
| 1212 | 6,755 |
| 1218 | 1,108 |
| 1219 | 52 |
| 1908 | 2,250 |
| 1909 | 10,703 |
| 1913 | 3,588 |
| 1914 | 1,119 |
| 1917 | 3,481 |
| TOTAL------ | 75,837 |

DISTRICT ___57 G___

PART OF BEXAR COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1802 | 8,245 |
| 1809 | 15,137 |
| 1810 | 3,502 |
| 1906 | 10,554 |
| 1907 | 3,903 |
| 1910 | 17,287 |
| 1911 | 5,311 |
| 1912 | 10,534 |
| TOTAL -------- | 74,473 |

DISTRICT ___57H___

PART OF BEXAR COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1616 | 4,339 |
| 1714 | 4,558 |
| 1717 | 4,944 |
| 1718 | 11,929 |
| 1719 | 3,921 |
| 1805 | 5,621 |
| 1806 | 8,933 |
| 1807 | 5,621 |
| 1808 | 2,504 |
| 1811 | 4,507 |
| 1812 | 2,390 |
| 1813 | 3,197 |
| 1814 | 395 |
| 1815 | 4,366 |
| 1816 | 2,996 |
| 1817 | 1,239 |
| 1818 | 2,246 |
| 1819 | 858 |
| 1915 | 1,311 |
| TOTAL -------- | 75,875 |

[A5679]

DISTRICT ___57 I___

PART OF BEXAR COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1607 | 8,779 |
| 1706 | 5,200 |
| 1707 | 6,881 |
| 1708 | 1,749 |
| 1709 | 8,354 |
| 1710 | 8,001 |
| 1711 | 4,898 |
| 1712 | 4,375 |
| 1713 | 8,236 |
| 1715 | 8,738 |
| 1716 | 3,158 |
| 1803 | 4,255 |
| 1804 | 2,189 |
| TOTAL -------- | 74,813 |

DISTRICT ___57 J___

PART OF BEXAR COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1105 | 5,431 |
| 1504 | 5,396 |
| 1601 | 9,450 |
| 1602 | 3,375 |
| 1603 | 5,881 |
| 1604 | 5,368 |
| 1605 | 11,516 |
| 1606 | 7,083 |
| 1702 | 10,850 |
| 1703 | 10,199 |
| TOTAL ------- | 74,549 |

DISTRICT ___57K___

PART OF BEXAR COUNTY:

| CENSUS TRACT | POPULATION |
|---|---|
| 1106 | 7,002 |
| 1107 | 2,485 |
| 1108 | 3,520 |
| 1701 | 10,133 |
| 1704 | 12,481 |
| 1705 | 5,401 |
| 1801 | 8,261 |
| 1901 | 4,437 |
| 1902 | 6,100 |
| 1903 | 516 |
| 1904 | 4,143 |
| 1905 | 10,432 |
| TOTAL | 74,911 |

Exibit-A.

DALLAS COUNTY CENSUS TRACTS—1970 POPULATION—PREPARED BY THE TEXAS LEGISLATIVE COUNCIL—MARCH 1971

Exhibit B

Bexar County
Representative Districts
57A - 57K

SAN ANTONIO - BEXAR COUNTY
BY CENSUS TRACTS

BEXAR COUNTY
1970

GREATER SAN ANTONIO CHAMBER OF COMMERCE
RESEARCH DEPARTMENT

| TOTAL POPULATION BY SECTION | | | |
|---|---|---|---|
| SECTION | 1970 | 1960 | CHANGE |
| 1100 | 37,411 | 56,406 | -33.7% |
| 1200 | 105,534 | 64,070 | +64.7% |
| 1300 | 79,268 | 70,407 | +12.6% |
| 1400 | 65,754 | 65,520 | + 0.4% |
| 1500 | 100,730 | 88,785 | +13.5% |
| 1600 | 121,864 | 100,758 | +20.9% |
| 1700 | 134,631 | 114,516 | +17.6% |
| 1800 | 89,539 | 52,327 | +71.1% |
| 1900 | 95,729 | 74,836 | +27.9% |
| TOTAL | 830,460 | 687,151 | +20.9% |

GOLDBERG, Circuit Judge (concurring specially):

I concur in the result of Section Four (4) of the Opinion.

JUSTICE, District Judge (concurring in part and dissenting in part).

I concur in the court's opinion in all respects, with the exception of its refusal to grant relief in the action brought in the Houston Division of the Southern District of Texas by certain black voters of Harris County, challenging the Reapportionment Plan of the Texas Senate as that plan applies to Harris County.

The plaintiffs contend: (1) That the State Senatorial Districts in Harris County, created by the Legislative Redistricting Board in 1971, were intentionally designed by the Board to cancel, dilute or minimize the voting strength of blacks in Harris County; or, alternatively, (2) that the effect of the creation of such new State Senatorial Districts by the Board was to cancel, dilute or minimize the voting strength of such blacks.

Harris County is a metropolitan county dominated by the City of Houston. Two political experts, Professor Richard

W. Murray of the University of Houston and Mr. Searcy Bracewell, a practicing attorney and registered lobbyist, testified to the political history and voting patterns of Harris County within recent years. The testimony of the experts coincided closely in many respects. Their testimony establishes that the dominant political party in Harris County is the Democratic Party. However, the western part of Houston and Harris County is a Republican stronghold. The Democratic Party in Harris County has a well defined cleavage between liberals and conservatives. The conservative faction of the Democratic Party controlled the single Harris County seat in the Texas Senate until 1966. However since that date, the situation has changed to the extent that, in the present five member delegation, there are four liberal Democrats and a Republican.

The evidence shows that the inner city of Houston, defined as the original fifty census tracts of the 1940 census, has a population of 431,000. Most of the residents of the inner city are black, but substantial numbers of Mexican-Americans and poor whites also reside there. Black voters in this area favor the Democratic Party overwhelmingly and support liberal Democrats to the same extent. Past voting patterns in the inner city demonstrate that, in legislative races, economic issue are paramount in the voters' minds, and that blacks and blue-collar voters ally themselves to elect liberal legislators. Consequently, despite the fact that blacks constituted a minority in the four senatorial districts that included a part of the inner city under the 1965 redistricting plan, the political viewpoint of blacks—liberal Democratic—was held by all four Senators. Moreover, one of the Senators, the Honorable Barbara Jordan, is a black.

In the redistricting plan for Harris County adopted by the Legislative Redistricting Board in 1971, the core of the city was again divided among four senatorial districts. Professor Murray categorized the new districts, as follows:

District 11 contains a 37% black population. The prevailing white majority is predominantly white collar middle class and upper middle class. However, the white voting pattern likely will be in favor of conservative Democrats and Republicans.

District 15 is 19% black. Included in its eastern part, near the heart of the city, are some of the city's poorest neighborhoods. In the western part of the district, on the other hand, are located neighborhoods of middle and upper class whites. Among these neighborhoods is the River Oaks area, one of the most affluent residential areas in the United States. The white voting pattern will probably favor conservative Democrats and Republicans, similar to the pattern of white voting in District 11.

Districts 6 and 7 contain 23% and 18% blacks, respectively. These districts reflect the same demographic and probable voting patterns as Districts 11 and 15. Districts 6 and 7, however, are somewhat more homogeneous than Districts 11 and 15.

District 13, containing only 4% black, is in a horseshoe shape, encompassing the eastern, western and northern suburbs of Harris County. In its eastern part, the district is for the most part liberal Democratic. To the north and west, the district becomes increasingly conservative.

Mr. Bracewell's expertise in Harris County politics is derived from his experience as a member of the Texas House of Representatives for two years, as a member of the State Senate from 1950 to 1959, and as a lobbyist for various corporate interests to the Texas Legislature since the latter date. At the last session of the Legislature, his clients included the Texas Association of Taxpayers, with a membership of more than 5,000, various utility companies, and other corporate interests. In representing his clients, Mr. Bracewell opposed bills to enact a corporate income tax and to establish a utilities commission. The bill to create a utilities commission did not come to

the Senate floor for a vote. The income tax measure was defeated in the Senate by a vote of 16 to 15. Generally, liberal Senators favored enactment of the corporate income tax bill, whereas conservatives were opposed to it. Mr. Bracewell, therefore, possessed a legitimate interest in electing State Senators of a conservative philosophy from Harris County.

In his deposition, Mr. Bracewell described, with admirable candor, his analysis of the requirements to be met, if conservatives were to succeed in electing conservative Democrats to the State Senate: It would be necessary, first, to devise two districts with a sufficient number of Democrats to defeat Republicans in the General Election; and, second, provide for a contingent of conservative voters in each district large enough to elect conservative candidates over liberal candidates in the Democratic Primary Elections. To accomplish this purpose, Mr. Bracewell examined and studied election returns, and decided that the requisites of the situation demanded that liberal (black) voting precincts in the inner city be rearranged.

As noted in the majority opinion of the court, the Texas Legislature failed to enact a bill to redistrict the Texas Senate at its last session, as required by the Texas Constitution. Under the provisions of the Constitution, the responsibility for preparing a redistricting plan then devolved upon the Legislative Redistricting Board, whose ex-officio members were the Honorable Crawford Martin, Attorney General, the Honorable Ben Barnes, Lieutenant Governor, the Honorable Gus Mutscher, Speaker of the House of Representatives, the Honorable Robert Armstrong, Land Commissioner, and the Honorable Robert S. Calvert, Comptroller.

The depositions of the members of the Legislative Redistricting Board indicate very clearly that Lieutenant Governor Barnes had effective control of the redistricting process. The Lieutenant Governor delegated the task of actually drawing the maps to Robert Spellings, his executive administrative assistant. Gregg Hooser, an employee of the Joint Committee for Legislative Redistricting, assisted Spellings in drawing the maps. Hooser, prior to beginning the actual drafting, had collected and had available to him massive amounts of data regarding racial compositions of census tracts, voting results covering several years, and socio-economic profiles of census tracts.

Mr. Bracewell testified that he consulted personally with all members of the Legislative Redistricting Board concerning State Senatorial Districts in Harris County except Commissioner Armstrong, with whom he discussed the situation by telephone. He consulted several times with the Lieutenant Governor and Mr. Spellings. He also spoke with Mr. Hooser regarding redistricting about ten times. On one of these occasions, Mr. Bracewell brought with him a colored map whose origin is obscure, but which came to be called the "Houston Chamber of Commerce map." This map, setting out proposed State Senatorial Districts in Harris County, was presented by him to Mr. Spellings. Mr. Spellings testified that the map had "a breakdown behind it that showed or that gave the Black population in each of those Senatorial Districts."

Although literally hundreds of citizens contacted the members of the Legislative Redistricting Board as to redistricting, in person, by correspondence, and by telephone and telegraph, and many of this number presented their own plans, Mr. Bracewell's views clearly appear to have carried the day, insofar as Harris County's State Senatorial Districts are concerned. Professor Murray contended that the map finally adopted by the Legislative Redistricting Board bears such a marked similarity to the Houston Chamber of Commerce map that the statistical probability of the two plans being unconnected is virtually nil. A comparison of the two maps, particularly the serpentine course of the boundaries of the Senatorial Districts in the area of

the inner city, will fully bear out Professor Murray's opinion.[1]

Mr. Bracewell testified that, under the Plan finally adopted by the Legislative Redistricting Board, two conservative Democrats "have a chance to be elected [as well as] two liberal Democrats and possibly one Republican." Professor Murray identified the two most conservatively oriented districts as Districts 7 and 15. It is worthy of note that two conservative Democrats, Representatives Lemmon and Ogg, who are "members of the team that has dominated the House of Representatives in recent years," and who have enjoyed the support of Mr. Bracewell in their past races, announced for the office of State Senator in Districts 7 and 15, respectively. Professor Murray further testified:

"[I]f one had to take a hundred plans that would be construed randomly . . ., I think this would be one of the two or three that would be most favorable to the interests of Mr. Ogg and Mr. Lemmon."

It was Professor Murray's further opinion that these districts, as drawn, are "very, very favorable to the election of Mr. Lee [sic] and Mr. Ogg."

Under the 1965 redistricting plan, District 11 originally contained approximately 47% or 48% blacks. Additionally, the white majority was made up primarily of lower middle class blue collar workers. As already mentioned, voting patterns indicate that this class of whites, where economic issues are at stake, will form coalitions with blacks to elect legislators, black or white. Such a coalition was, in fact, formed when Senator Barbara Jordan was elected to the Senate from District 11 in 1966. In contrast, the new District 11, although it contains 37% blacks—just as did the old District at the time of the 1970 census—, has blacks paired with middle class and upper middle class whites. Analysis of voter registration, voter turnout, and precinct results reveal that the whites will have political strength far out of proportion to their 65% majority. Voting habits of the whites in District 11 also demonstrate that, in a State Senatorial contest, the likelihood of forming a coalition with blacks is unlikely. Although Senator Jordan refused to concede that she could not be elected in the new Senatorial District 11, it was the opinion of Professor Murray that the four Senatorial districts are so arranged that no possibility exists for a black to be elected. Even Senator Jordan felt, however, that it would have been more difficult for her to prevail in the new district than the old.

The net effect of the Legislative Redistricting Board's action has been, again, to fragment the inner city black voters into four districts. But while in the past these blacks' political viewpoint was represented by four liberal Democrats, one of them black, henceforth they are likely to be represented, in two of the inner city districts, by Senators belonging to a faction of the Democratic Party which has been, in the past, inimical to the interests of blacks.

It is settled beyond any doubt that a claim of racial gerrymandering presents a justiciable issue. Gomillion v. Lightfoot, 364 U.S. 339, 346, 81 S.Ct. 125, 5 L.Ed. 2d 110 (1960). Subsequently, the Supreme Court in Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), a case involving an attack on single member districts allegedly drawn on racial lines, apparently deemed the matter to be self-evident, for it did not even discuss justiciability before proceeding to the merits. In later cases, the lower courts have uniformly interpreted Gomillion and Wright as foreclosing the matter. E. g., Smith v. Paris, 257 F. Supp. 901, 904 (M.D.Ala.1966); Sims v. Baggett, 247 F.Supp. 96, 104 (M.D.Ala. 1965).

---

1. A copy of the Legislative Redistricting Board's map appears in the Appendix as Exhibit I. A copy of the configurations of the proposed Harris County Senatorial Districts set out in the Houston Chamber of Commerce map appears in the Appendix as Exhibit II.

Proceeding now to the merits of the racial gerrymandering claim, the first question becomes that of the proper constitutional standard to be applied. In the cases involving attacks on multimember districts, the Supreme Court has articulated the test as follows: A multimember apportionment scheme is unconstitutional if, under the circumstances of a particular case, it operates to minimize or cancel out the voting strength of racial or political elements of the voting population. Whitcomb v. Chavis, 403 U.S. 124, 144, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); Burns v. Richardson, 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). I am persuaded that the multimember district problem and the gerrymandering problem are sub-species and manifestations of a more basic problem. By whatever name the more basic problem is called, it amounts to this: discriminatory action whereby the party or political power group which actually accomplishes the redistricting uses its power to transform its actual voter strength into the maximum of legislative seats and to convert the other party's actual voter strength into the minimum of legislative seats. Just as majority party bias or racial effect can be exaggerated by creating multimember districts large enough to submerge racial and political minorities, so the same result can be accomplished by conscious partisan line skewing. See Dixon, The Court, The People, and "One Man, One Vote", Reapportionment in the Seventies 29–30 (Polsby ed. 1971); Dixon, Democratic Representation, 462 (1968). Thus, while I am not necessarily compelled by the internal logic of the similarity noted above, the fact that the Fortson-Burns-Whitcomb standard is used to solve one aspect of the basic problem is persuasive that the same standard should be used to solve another aspect of the same basic problem. Moreover, language in Gomillion v. Lightfoot, supra, 364 U.S. at 345, 347, 81 S.Ct. 125, 5 L.Ed.2d 110 and in Wright v. Rockefeller, supra, 376 U.S. at 56, 84 S.Ct. 603, 11 L.Ed.2d 512, supports the application of the Fortson-Burns-Whitcomb standard to the problem of racial gerrymanders.

Applying the Fortson-Burns-Whitcomb criteria to the evidence adduced to support the claim of racial gerrymandering, I am of the opinion that the evidence more than amply supports a conclusion that the Senate districts in Harris County designedly operate to dilute, minimize, and cancel out the voting strength of blacks. Certainly, when the evidence of design is coupled with the manifest consequences and clear effect of the plan promulgated for Harris County, an inference of discriminatory design is compelled. See Smith v. Paris, supra. It should be pointed out that Commissioner Armstrong adamantly refused to sign the plan finally adopted by the Legislative Redistricting Board, because, in his opinion, the votes of the inner city blacks in Houston were diluted. He communicated his opinion to the Attorney General and the Lieutenant Governor, hence it can hardly be contended that the Board was unaware of the plan's inherent vice.

The spirit of the statement of a three-judge court in Alabama is applicable to the situation at hand: "The . . . plan adopted by the . . . Alabama Legislature was not conceived in a vacuum. If this court ignores the long history of racial discrimination in Alabama, it will prove that justice is both blind and deaf." Sims v. Baggett, supra, 247 F.Supp. at 109. See Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971); Sims v. Amos, 336 F.Supp. 924, (M.D.Ala.1972). Compare: Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1943); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); United States v. Texas, 384 U.S. 155, 86 S.Ct. 1383, 16 L.Ed.2d 434 (1966).

I am of the opinion that the Court would be justified in adopting Professor Murray's plan as an interim solution to

the problem before it.[2] Although the Court requested both plaintiffs and defendants to submit plans at the conclusion of the case, Professor Murray's plan is the only plan on file. His plan in no way cancels out, dilutes, or minimizes the black vote. Although his plan would make it likely that a black Senator would be elected from District 15, as shown on his plan, that result would not be an egregious inflation of the black vote, given the proportion of blacks living in Harris County.

By this, I am not to be taken to mean that I believe blacks are necessarily entitled to proportional representation. The law appears to be to the contrary. Whitcomb v. Chavis, *supra*, 403 U.S. at 156, 91 S.Ct. 1858, 29 L.Ed.2d 363. I approach the problem from a pragmatic standpoint, trying at the same time to stay out of the political thicket. Reynolds v. Sims, 377 U.S. 533, 587, 84 S.Ct. 1362, 12 L.Ed.2d 506.

JOHN H. WOOD, Jr., District Judge (*concurring in part and dissenting in part.*)

In concurring in part and dissenting in part with the Judgment, I make the following:

## GENERAL OBSERVATIONS FOR CONSTITUTIONAL LAW APPLICABLE

Mr. M. R. Justice Harlan's separate Opinion in Whitcomb v. Chavis demonstrates the evident "malaise among the members of the Court" with prior decisions in the field of voter qualifications. He further observes that the "suggestion implicit in the Court's Opinion that Appellees may ultimately prevail if they make their record in these and like respects should be recognized for what it is: a manifestation of frustration by a Court that has become trapped in the 'political thicket' and is looking for a way out." Mr. Justice Harlan continues:

"This case is nothing short of a complete vindication of Mr. Justice Frankfurter's warning nine years ago 'of the mathematical quagmire (apart from divers judicially inappropriate and elusive determinants) into which this Court today catapults the lower courts of the country.' Baker v. Carr, 369 U.S. 186, 268 [82 S.Ct. 691, 7 L. Ed.2d 663] (1962) (dissenting opinion). With all respect, it also bears witness to the morass into which the Court has gotten itself by departing from sound constitutional principle in the electoral field. See the dissenting opinion of Mr. Justice Frankfurter in Baker v. Carr, supra, and my separate opinions in Reynolds v. Sims, 377 U. S. 533, 589 [84 S.Ct. 1362, 1395, 12 L. Ed.2d 506] (1964), and in Oregon v. Mitchell, 400 U.S. 112, 152 [91 S.Ct. 260, 279, 27 L.Ed.2d 272] (1970). I hope the day will come when the Court will frankly recognize the error of its ways in ever having undertaken to restructure state electoral processes.

"I would reverse the judgment below and remand the case to the District Court with directions to dismiss the complaint."

While I personally agree with Mr. Justice Harlan, since the Supreme Court of the United States has entered this almost admitted impregnable political jungle, I have no alternative but to comply with this Mandate to act in these cases as best I can. While realizing my own short-comings and lack of expertise in the field of restructuring the structure of States' political processes, I must follow the law, whether I agree with it or not.

At a time in the distant past, the test of constitutionality of State action seemed to depend on whether or not it could be shown that the action was arbitrary, unreasonable or capricious. As Mr. Justice Brandeis stated in the case of O'Gorman & Young v. Hartford Fire Insurance Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324 (1931), the presumption

---

2. Professor Murray's plan is shown in the Appendix as Exhibit III.

of constitutionality of legislative action must prevail in the absence of some factual foundation in the record for overthrowing the action or where the record fails to show unreasonable action. (Citing cases at f/n 3.) See also "The Presumption of Constitutionality", 31 Col.L. Rev. 1136 (1931).

Whitcomb v. Chavis, supra, appears to deviate and depart from this earlier concept and seems to foreordain and drape the Trial Judges with the awesome mantle of omnipotence and unerring clairvoyance in determining when State action "operate[s] to dilute or cancel the voting strength of racial or political elements". It is apparent from the most cursory perusal of the testimony of the expert lay witnesses that reasonable men, and even the Judges disagree profoundly as to the propriety of the Texas Redistricting Board's plan for reapportionment of its House and Senate.

Under the present concept, the primary test of constitutionality in these cases is not the question of reasonableness, *vel non*, but rather turns on the question of whether the evidence merely preponderates against the fairness of the plan.

I have been ever mindful of the admonition to me on the eve of my induction as a Federal Judge by the Honorable John R. Brown, Chief Judge, U. S. Court of Appeals for the Fifth Circuit, when he reminded me that I was "appointed, not anointed". While I deplore the intrusion of the Federal Courts in the legislative affairs of the democratically elected officials of the sovereign State of Texas, who act as a Redistricting Board under the constitution of this State, it is apparent that I must follow the Mandate of the Supreme Court and declare portions of the Redistricting and Reapportionment Plan invalid, if it appears from a preponderance of the evidence that the plan in any respect fails to meet the "one-person, one-vote" concept or it "dilutes or minimizes" and not necessarily "cancels" minority voting rights.

The uncertainty and ambiguity of testing constitutionality as set forth in Whitcomb v. Chavis, supra, makes its application most difficult, if not impossible, to this case. The only directive to the lower Court is that it is instructed to endeavor to prevail upon the Indiana Legislature to consider certain elements and factors that might improve the ethnic and minority voting representations of the losers in a pluralitarian election. All of this is apparently done under the Civil War Amendments. The Federal Courts are thus in effect using these amendments to judicially amend the Constitution without following the method prescribed by the Constitution itself. Federal Courts are enlarging rights not given under the Constitution by entering fields of purely State and local legislative management where there is little or no expertise on the part of the Federal Judiciary. Interjection by Federal Courts in this manner is a sad indictment and commentary on our heretofore sacred Democratic processes and we are in effect judicially branding our Democratic form of Government a failure in the form created under our Constitution.

For the reasons stated, I believe that this Court should exercise as much judicial restraint as possible in declaring the State Reapportionment Plan unconstitutional; however, where in those instances, as here, the Court has deemed it necessary, the State should have every opportunity to correct its alleged mistakes where time permits.

## THE CHALLENGE OF THE LEGISLATIVE REDISTRICTING BOARD'S PLAN FOR THE HOUSE OF REPRESENTATIVES

As the Opinion and Judgment of the Court in this case correctly states, various plaintiffs challenged the constitutionality of the entire Legislative Redistricting Board's plan for the House of Representatives on the grounds that unconstitutional deviations and disparities exist in the population of many House Dis-

tricts and that multi-member districts in Texas are not uniform and result in invidious discrimination among certain racial and political elements.

In declaring the entire plan invalid my two learned colleagues rely on prior holdings of the Supreme Court that whenever the fact of deviation from population equality is raised, the burden falls upon the State to present "acceptable reasons for the variations among the populations of the various legislative districts". Swann v. Adams, 1967, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501; and Kirkpatrick v. Preisler, 1969, 394 U.S. 524, 89 S.Ct. 1225, 22 L.Ed.2d 519 (a Congressional redistricting case which holds "(the Constitution) permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality or for which justification is shown." However, the Supreme Court permits greater population deviation in the apportionment of State Legislatures, which is involved in this case. Reynolds v. Sims, 377 U.S. at 577–578, 84 S.Ct. 1362, 12 L.Ed.2d 506. See also Abate v. Mundt, 1971, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399, which upheld a county legislative apportionment with a total deviation of 11.9%. However, the Court itself made very clear that *Abate* was *sui generis,* involving only local government apportionment. And the *Kirkpatrick* holding may substantially erode the "tolerance" dictum in *Reynolds.* While it is obvious under the present constitutional standards that the evidence no longer has to establish that the State action, to be invalid, must be arbitrary, unreasonable or capricious; however, it must be more than mere suspicion, surmise or conjecture.

The percentage deviations shown in the legislative districts analyzed in the Opinion demonstrate that they are not unreasonable and are not, per se, a discrimination against "all of the people of Texas", as the Opinion maintains. Furthermore, the State of Texas (although I doubt it was required to do so under the meager evidence on this point which plaintiffs in their Briefs concede) went forward and explained and gave adequate reasons for the deviations which admittedly did not exceed in excess of 5.7% on the plus side and was not more than 4.1% on the minus side, except, of course, in Dallas County, which was a multi-member district and which deviation in Dallas County has been cured by the Court's prescribed single-member plan which this Court adopted and which replaced the multi-member district plan of Dallas, which allegedly had an approximately minus deviation of 21.6%. Certainly, I do not feel it is fair to the Redistricting Board of Texas to declare the entire plan invalid, especially since the Dallas plan now with the new single-member districts meets the population requirements of "one-person, one-vote".

My colleagues also criticize the entire State's plan because it is allegedly not a product of legislative action, but of the action of a "board of five members, only one of whom is a member of the legislature". This overlooks the fact that this is a Board created under the provisions of Article III, Section 28, of the Constitution of Texas, for the purpose of redistricting the House and Senate of the State, where the Legislature in effect authorizes this Board to act, if the Legislature fails to do so. A most important element that this Court overlooks is that the officials who have been constitutionally designated to fill this vital role are five of the most prestigious officials elected by all of the people of the State of Texas, to-wit: the Lieutenant-Governor, the Speaker of the House of Representatives, the Land Commissioner and the Comptroller of Public Accounts, which Board acted in this case under the advice and counsel of the also democratically elected Attorney General of Texas. The Opinion concludes that "we have serious doubts that this board did the sort of deliberative job contemplated by *Reynolds* [v. Sims] as worthy of judicial abstinence." How the majority opinion reaches this conclusion from all the evidence in this case is a distinct mystery to me. In any event, the test is not the number of meet-

ings or the type of "deliberative job" done by the Redistricting Board. Actually, the test is one of population and, even here, the mathematics do not have to be precise. See Reynolds v. Sims, supra, which holds: "Mathematical *exactness* or *precision* is hardly a workable constitutional requirement." (Emphasis supplied.)

The majority then finds that Texas has failed to justify the deviations which are analyzed in the opinion. All of the evidence adduced on the trial of this case conclusively establishes that a rational State policy does exist in Texas and requires adherence to County lines except in inter-urban areas under Article III, Section 26, Texas Constitution. In Texas, a violation of County lines is justifiable in legislative redistricting only where a requirement of Federal law may be demonstrated. Smith v. Craddick (Tex.Sup.Ct., 1971) 471 S.W.2d 375. Kirkpatrick v. Preisler, supra, supports the proposition that the State must do its best and must not settle for some fixed variation "small enough to be considered *de minimus* and to satisfy without question the 'as nearly as practicable' standard".

The Supreme Court of Texas obviously had in mind the tolerances of Reynolds v. Sims, undefined as they are, and while recognizing the difficulties presented, said 471 S.W.2d at 379:

"However, this court may not abrogate any provision of the constitution for the sake of simplicity. The federal requirement of equal representation clearly has not nullified Section 26 of Article III in its entirety."

The majority opinion then states that Texas has "also failed to provide rational justification for the haphazard combination of single and multi-member districts at issue in this case". The opinion then continues:

"This irrationality, without reason justification, may be a separate and distinct ground for declaring the plan unconstitutional."

I respectfully submit that such a holding is contrary to Whitcomb v. Chavis, supra, which states the following:

"But we have insisted that the challenger carry the burden of proving that multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements."

Whitcomb v. Chavis, supra, at 149, 91 S.Ct. at 1872, concludes further that ". . . there is no suggestion here that Marion County's multi-member district, or similar districts throughout the State, were conceived or operated as purposeful devices to further racial or economic discrimination."

Whitcomb v. Chavis, supra, further finds that "affirmance of the District Court would spawn endless litigation".

I can think of nothing which illustrates better the agonizing chaos which exists in the area of restructuring the political districts of the sovereign States than this decision, wherein it is painfully obvious that the three Judges composing this very Court have almost no unanimity in finding a path from the impenetrable thicket in which the Federal Courts now find themselves.

The plaintiffs who challenge the multi-member districts throughout the State of Texas, other than in Dallas and Bexar Counties, readily concede that because of the pressures and lack of time they were unable to develop a full record of unconstitutionality as to the other counties and the impact of the at-large systems throughout the State. Furthermore, since the evidence is admittedly deficient as to the alleged inequities in the other Counties, and there have been no complaints by any citizens from those other large metropolitan "at-large districts", I feel that this is an additional reason for upholding the validity of the State's plan after the inequities have been corrected by new plans which this Court has prescribed for Dallas and Bexar Counties.

While I wholeheartedly disagree with my colleagues, who have declared this State's plan unconstitutional, I do concur in their generosity in affording the State of Texas until on or before July

1, 1973 to adopt a plan to reapportion the legislative districts for the House of Representatives in accordance with the guidelines as set out in the Opinion and Judgment of this Court.

## SUITS INVOLVING THE SENATORIAL DISTRICTS IN HARRIS AND BEXAR COUNTY

I join with Judge Goldberg in upholding the validity of the Reapportionment Plan of the State of Texas for its Senatorial Districts. The Senatorial Districts throughout the State are single-member districts and the population requirements of "one person, one vote" have apparently been achieved.

Inasmuch as no plan for Senatorial Redistricting in Bexar County or Harris County into different shaped single-member districts meets the wishes, requirements and needs of everyone and there is a vast difference of opinion almost equally divided as to what the best means of dividing the districts would be, and inasmuch as it appears that the plaintiffs have failed to sustain their burden of proving by a preponderance of the evidence that the Senatorial Districts operate to dilute or cancel the voting strength of racial or political elements, I agree that the action of the Redistricting Board is valid and constitutional.

The Supreme Court, in Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed. 2d 771 (1967), approved the lower court's statement that the court's inquiry "must end when it is satisfied that the judicially-ascertainable standard of substantial equality of population in the districts has been achieved". Kilgarlin v. Martin, 252 F.Supp. at 434.

In the Houston case, Senator Barbara Jordan, a Black, testified that she would not concede that she could not win from the new Senatorial District 11 because she believed that she could appeal to a broad base of the voters. Even Doctor Murray, the expert witness for the plaintiffs in the Houston case, concedes that

a certain amount of gerrymandering is absolutely essential in any event in Harris County to meet the requirements of population and other considerations of population and other considerations such as ethnicticity, contiguity, and community of interests.

In the San Antonio (Bexar County) case, the two Senatorial posts are filled by an Anglo and a Mexican-American. The Mexican-Americans are not a minority in Bexar County; they comprise a group nearly equal in size to the Anglo group. Senatorial District 21 combines approximately 110,000 people of Bexar County with approximately 250,000 people from rural counties East, West and South of Bexar County, and although there is no real community of interest between the two groups, a division of some sort is necessary to maintain the "one person—one vote" requirement, and it appears that even if the 110,000 persons from Bexar County were to be taken from any other portion of Bexar County than from the North side, there would be no substantially greater community of interest established.

## THE CHALLENGE AGAINST THE MULTI-MEMBER LEGISLATIVE DISTRICTS IN BEXAR AND DALLAS COUNTIES

While I deplore, as heretofore stated, the intrusion of the Federal Courts in the legislative affairs of the democratically elected officials of the sovereign State of Texas, Whitcomb v. Chavis, and its progeny, dictate that Federal Courts must do so where the preponderance of the evidence discloses that the State action "operate[s] to dilute or cancel the voting strength of racial or political elements". In this connection, I personally feel that the evidence does in fact preponderate in this direction and that, based on this test, I concur with my colleagues that the Board's Reapportionment Plans for multi-member districts in Bexar and Dallas Counties are unconstitutional for the various reasons stated in the majority opinion.

# BOARD DISTRICTS

CENSUS TRACTS of HARRIS COUNTY, TEXAS

_Exhibit I_

_Exhibit II_

EXHIBIT III